## State of Vermont v. Candace and George A. Rogers, Jr.

[638 A.2d 569]

No. 91-561

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 27, 1993

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Richard A. Unger* and *Matthew Colburn*, Montpelier, for Defendants-Appellants.

**Dooley, J.** Defendants Candace and George Rogers appeal the denial of their motion to suppress evidence obtained in a search of their home, arguing that the warrant under which the search was conducted was defective. Defendants assert that the visual observation of their garden, performed by a state trooper for the purpose of corroborating an anonymous tip that defendants were cultivating marijuana on their property, was an illegal search under the federal and Vermont constitutions and consequently could not support a finding of probable cause for issuance of the search warrant. We affirm.

Defendants own a tract of wooded property on Chapel Road in Bennington, where they have constructed their home. The house lies in a clearing that includes a pond and, approximately 150 feet from the house, a large garden. The residence is secluded, as the thick growth of woodland prevents observation of the house and garden area from adjoining properties or the road.

In late August 1987, an anonymous informant telephoned a Vermont State Police trooper with information that a large marijuana garden was under cultivation at the Rogers' residence. The informant described to the trooper the point along Chapel Road at which he could enter the Rogers' property and, after traveling approximately 100 feet into the woods, reach a vantage point from which he could see a garden of eight- to ten-foot-tall marijuana plants. The caller also advised the trooper that the garden was protected by surveillance equipment. In a second telephone conversation, the informant told the trooper that an unidentified person had been caught in the garden by occupants of the house and threatened at gunpoint, and that because of this discovery, the marijuana had likely been harvested.

The trooper went to the site described by the informant, entering the woods from Chapel Road by a "type of path" that disappeared as the trooper advanced into the woods. He attempted to maintain a straight line through the thick vegetation, but was forced to cross a stretch of swampy terrain before reaching a point affording a view of defendants' garden area. From this position, he was able to observe that the garden was planted half with corn and that the other half had been recently harvested and tilled. The garden was surrounded by sheep fencing with a locked door, and there were cameras and spotlights positioned at its edge. Based on the anonymous tip and his personal observations, the trooper obtained a search warrant for defendants' residence and curtilage, where the state police seized a quantity of recently harvested marijuana from the house and outbuilding.

Defendants were charged under 18 V.S.A. § 4224 with cultivation of marijuana and possession of marijuana with intent to sell. Prior to trial, they filed a motion to suppress the evidence seized under the search warrant, arguing that the trooper's incursion on their land was an illegal search and could not be used to support probable cause for the warrant. The trial court originally granted defendants' motion to suppress, finding the defendants' garden within the curtilage of their home and that the investigating officer's actions had interfered with their reasonable expectation of privacy. Therefore, because the trooper's observations could not be used to establish probable cause for

the warrant, the court ruled that the seized evidence was inadmissible.

The State appealed this ruling. On remand from this Court, the trial court reversed its previous decision and denied defendants' motion. The court concluded that the trooper's visual inspection of defendants' garden did not violate the Fourth Amendment because he did not physically invade defendants' curtilage. The court further found that the trooper's actions did not violate Chapter I, Article 11 of the Vermont Constitution because, in the absence of affirmative steps by the defendants to demonstrate a reasonable expectation of privacy in their woods, the police were justified in entering such "open fields" and observing anything in plain view.

On appeal, defendants assert that the garden area is clearly within the curtilage and, because their expectation of privacy in that area was both subjectively and objectively reasonable, the State was required to obtain a warrant before visually inspecting it. They argue that the natural exclusionary barrier—the woods—within which they constructed their home and garden conveyed their expectation of privacy in such a way that an objective person would know they sought to avoid the public gaze. Defendants claim that the trial court misapplied federal and state constitutional law by failing to recognize the high degree of protection afforded areas within the curtilage of a home.

The State suggests two summary means of affirming the decision below; neither was adopted by the trial court. Because we conclude neither means is supported by the record, we discuss them only briefly.

The State's first theory is that defendants invited onlookers to the vantage point used by the trooper by allowing a path to exist to that point. The trial court findings are not explicit on this point. They describe the trooper as following a "100 foot path," but emphasize the "very thick undergrowth," the surrounding trees and the swampy nature of the land. We have reviewed the evidence and find no support for the existence of a worn path from the mailbox to the place of observation. We conclude that the trial court used the word "path" to describe the trooper's route of travel and not to find a preexisting footway all the way to the observation point.

The second means of summary affirmance is more complicated. As discussed in more detail below, defendants' theory un-

der either the Fourth Amendment to the United States Constitution or Chapter I, Article 11 of the Vermont Constitution depends upon the garden being within the curtilage to the house. The State argues that the garden is outside the curtilage and the decision can be affirmed on that basis. For the reasons discussed below, we reject this argument.

The trial court decision is also not explicit on this point. In its first decision, the trial court found that the garden was within the curtilage and decided for defendants on that basis. In the second decision following the remand, the court changed one finding of fact without taking new evidence. It changed its finding on the distance between the house and the garden from 90 feet to 150 feet. It did not, however, modify its determination that the garden was within the curtilage, probably in part because its new theory of analysis made this determination irrelevant. It concluded that as long as the trooper did not enter the curtilage, no search occurred. It is undisputed that the trooper did not enter the curtilage.

■■ We agree with the State that the determination of the boundary of the curtilage is a mixed question of fact and law, entitled to some deference in this Court. See *State v. Beresford*, 156 Vt. 333, 335, 592 A.2d 882, 883 (1991) (finding of abandonment that would allow warrantless search reviewed under clearly erroneous standard). We do not agree, however, that we should treat the trial court decision as finding the garden to be outside the curtilage. The court's only finding on the curtilage issue is to the contrary, and the court did not modify its finding despite the change in the subsidiary distance finding. This is the finding to which we must defer.

■ The curtilage is an area outside the physical confines of a house into which the "privacies of life" may extend, and which receives the same constitutional protection from unreasonable searches and seizures as the home itself. *Oliver v. United States*, 466 U.S. 170, 180 (1984); see *State v. Byrne*, 149 Vt. 224, 227, 542 A.2d 276, 278 (1988). In determining the confines of the curtilage, we have looked to the factors set forth in *United States v. Dunn*, 480 U.S. 294, 301 (1987): (1) the proximity of the area in question to the home; (2) whether the area in question is included within an enclosure surrounding the home; (3) the na-

ture of the uses to which the area is put; and (4) the steps taken to protect the area from observation by people passing by. The trial court applied these factors, and found that defendants' garden is within the curtilage of their home.*

Although the question is close, we affirm the trial court's conclusion that the garden was within the curtilage of the home. The nature of defendants' property is such that a distance of 150 feet from home to garden is not excessive. See *United States v. Van Dyke*, 643 F.2d 992, 994 (4th Cir. 1981) (in "secluded setting" it is reasonable to conclude that the curtilage may embrace area fifty yards from home). But cf. *Dunn*, 480 U.S. at 301 (barn located sixty yards from house not within curtilage). Defendants' home is not an urban residence for which privacy expectations are reduced exponentially as the distance from the home increases. Moreover, the house and garden were constructed inside a clearing that affords substantial privacy from the casual passersby. We do not agree with the State's argument that the garden was physically separated from the house by the presence of the pond and a small private bridge. We fail to see how these topographical features provide any significant sense of separation between the house and garden.

The second *Dunn* factor, whether the curtilage is enclosed, favors the trial court's decision that the garden was within the curtilage because defendants' house and garden are surrounded by a thickly wooded band of property that serves as a natural enclosure for their residence. Other courts have found a natural barrier effective to define the curtilage, see, e.g., *State v. Russo*, 683 P.2d 163, 165 (Or. Ct. App. 1984); *State v. Lange*, 463 N.W.2d 390, 393 (Wis. Ct. App. 1990), and *Dunn* does not require that the enclosure be a man-made structure. See *Dunn*, 480 U.S. at 301. Nevertheless, as discussed in more detail *infra*, we do not view the natural boundary caused by the surrounding

* We examine the *Dunn* factors utilized by the trial court in its determination that defendants' garden is within the curtilage of their home for the purpose of evaluating the reasonableness of that conclusion. Defendants have relied on these factors and have not suggested they are inappropriate in analyzing compliance with Article 11 of the Vermont Constitution. We leave to another day the question of whether the Vermont Constitution requires us to adopt a different definition of the curtilage than that adopted by the United States Supreme Court or to attach different significance to the curtilage.

woods as creating a reasonable expectation of privacy from examination by a person located in the woods.

The third *Dunn* factor, the uses to which the area is put, supports the trial court's decision because gardening is an activity often associated with the curtilage of a home. Finally, the fourth *Dunn* factor, the steps taken to prevent observation from outside the curtilage, does not weigh heavily against defendants. The woods that surround the residence, although not expressly grown for the purpose, substantially shield the garden from the view of normal passersby. We do not think more is required to associate the garden with the home and give it the protection of the curtilage. We find this *Dunn* factor to be relatively insignificant in this context.

▮ The trial court's findings on each of the four elements of the *Dunn* test are reasonable. Taken as a whole, the court's conclusion that defendants' garden is within the curtilage of their home is clearly supported by credible evidence, and therefore, the ruling must stand.

Even though we affirm the trial court's finding that the garden is within the curtilage, this does not end our inquiry; affirmance on this issue is not determinative of whether a search occurred in the constitutional sense when the trooper observed the garden from the woods. Indeed, our consideration of defendants' argument that the search violated their rights under the Fourth Amendment to the United States Constitution is informed by precedent indicating that the place of observation is normally more important than the place observed, at least in cases similar to this one. That conclusion results from the combined effect of two principles that are now firmly implanted in Fourth Amendment jurisprudence.

▮▮ The first principle is that there is no constitutionally recognizable privacy interest for land outside the curtilage, commonly termed "open fields." See *Oliver*, 466 U.S. at 179. The open-fields doctrine applies to any land that is "unoccupied or undeveloped." *State v. Kirchoff*, 156 Vt. 1, 3, 587 A.2d 988, 990 (1991). Under the open-fields doctrine, the trooper could conduct a constitutional, warrantless search in any of the hundred feet of woods between the road and the cleared area behind defendants' house whether or not there was a path through the wooded area. See also *Oliver*, 466 U.S. at 181.

■ The second principle, which is an aspect of the "plain view" doctrine, see 1 W. LaFave, Search and Seizure § 2.2(a), at 322 (2d ed. 1987), is that constitutional protections do not attach to activities or possessions that "a person knowingly exposes to the public." *Katz v. United States*, 389 U.S. 347, 351 (1967). Therefore, while an area may be within the curtilage, there still may be no constitutional protection if activity in that area is knowingly exposed to the public.

■ In *United States v. Dunn*, the United States Supreme Court applied this second principle to an observation of an area within the curtilage from an area in open fields. 480 U.S. at 303–05. The open field involved was an area immediately outside a barn on the defendant's ranch, which the police reached by crossing a number of fences. From this vantage point, the police peered into the barn and observed drug paraphernalia. In response to the argument that the police invaded the curtilage, the Court held:

> It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn. As previously mentioned, the officers never entered the barn, nor did they enter any other structure on respondent's premises. Once at their vantage point, they merely stood, outside the curtilage of the house and in open fields upon which the barn was constructed, and peered into the barn's open front. And, standing as they were in open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn. This conclusion flows naturally from our previous decisions.
>
> Under *Oliver* . . ., there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields. Similarly, the fact that the objects observed by the officers lay within an area that we have assumed . . . was protected by the Fourth Amendment does not affect our conclusion.

*Id.* at 304. With respect to the defendants' Fourth Amendment argument, this case is controlled by *Dunn*. We hold that the

trooper's observation of the garden area was not a search requiring a warrant under the Fourth Amendment, whether or not the garden lies within the curtilage. Accord *Standley v. State*, 751 S.W.2d 364, 365–66 (Ark. Ct. App. 1988) (on similar facts, observation of garden within curtilage from "area of heavy woods" not Fourth Amendment search); *People v. Freeman*, 268 Cal. Rptr. 603, 604, 606 (Ct. App. 1990) (observation of greenhouse attached to trailer from heavily forested area "covered with brush and poison oak" not Fourth Amendment search).

■ In reaching this holding, we emphasize the absence of two factors that could have changed our conclusion: affirmative action by defendants to block observation of the garden from the surrounding woods and use of technology by the trooper to aid his observation. With respect to the first factor, defendants' privacy claim is based on the existence of those woods, and the natural barrier to observation and passage they create, but not on any change caused by defendants' actions. Although we agree that the woods form a natural definition of the scope of the curtilage, we find no support for the proposition that undeveloped land loses its character as an open field as it becomes thickly wooded. See *Oliver*, 466 U.S. at 180 n.11 ("a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment"); *Commonwealth v. Lewis*, 191 N.E.2d 753, 759 (Mass. 1963), *cert. denied*, 376 U.S. 933 (1964) (swamp is open field). We leave to another day the case in which a landowner, by fencing or other means, takes steps to protect the curtilage from observation, but the curtilage is nevertheless observed. Cf. *State v. Waldschmidt*, 740 P.2d 617, 623 (Kan. Ct. App. 1987) (holding that Fourth Amendment search had occurred when officer climbed neighbor's barbed wire fence to see over defendant's stockade fence into curtilage, balanced himself against fence and placed both his arm and flashlight over fence).

With respect to the second factor, we note that the trooper's observation was unaided by technology. Since he came right up to the garden, he did not even have to use binoculars to view it closely. Because we do not have any technological enhancement before us in the facts of this case, we will leave consideration of this issue for another day. Compare *Commonwealth v.*

*Lemanski*, 529 A.2d 1085, 1092 (Pa. Super. Ct. 1987) (observation of greenhouse within curtilage from point 200 feet away by use of binoculars with zoom lens was Fourth Amendment search), with *State v. Vogel*, 428 N.W.2d 272, 275 (S.D. 1988) (on similar facts, no search). See generally Power, *Technology and the Fourth Amendment: A Proposed Formulation for Visual Searches*, 80 J. Crim. L. & Criminology 1 (1989).

██ ██ Our decision concerning defendants' Fourth Amendment argument is not, however, dispositive of their claim under the Vermont Constitution. Article 11 of Chapter I of the Vermont Constitution provides an independent authority under which we may decide the issues in this case. *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982). It "may afford greater protection to individual rights than do the provisions of the federal charter." *State v. Kirchoff*, 156 Vt. at 4, 587 A.2d at 991; see also *State v. Platt*, 154 Vt. 179, 184, 574 A.2d 789, 792 (1990) (Vermont Constitution may restrict police conduct to greater extent than Fourth Amendment). As our paramount concern in search and seizure cases is to give effect to the core values of privacy underlying Article 11, we have not hesitated to depart from the parallel federal law when necessary to accomplish this goal. See, e.g., *State v. Berard*, 154 Vt. 306, 310, 576 A.2d 118, 120 (1990) (rejecting federal rule on searches of prison inmates); *State v. Wood*, 148 Vt. 479, 489, 536 A.2d 902, 908 (1987) (rejecting federal search and seizure standing analysis).

Indeed, we have rejected, at least in part, the first of the two principles on which our Fourth Amendment conclusion rests—the per se *Oliver* rule that there is no constitutionally recognizable privacy interest in open fields. See *Kirchoff*, 156 Vt. at 9–10, 587 A.2d at 994. Instead, we held in *Kirchoff* that a landowner has a constitutionally protected interest in undeveloped land "where it is apparent to a reasonable person that the owner or occupant intends to exclude the public." *Id.* at 14, 587 A.2d at 997. We described the circumstances in which the interest arises as "where the landowner has taken steps, such as fencing or posting, to indicate that privacy is exactly what is sought." *Id.* at 8, 587 A.2d at 993.

In *Kirchoff*, we found the observation of marijuana plants growing on defendant's land to be a search under Article 11 because the defendant had posted the land pursuant to 10

V.S.A. § 5201 and the police walked by "no trespassing" signs that clearly indicated defendant's intention to prohibit entry. See *Kirchoff*, 156 Vt. at 14, 587 A.2d at 996. In the companion case of *State v. Chester*, 156 Vt. 638, 638, 587 A.2d 1008, 1009 (1991), we found no constitutional violation in the police observation of marijuana on defendant's undeveloped land because there were no "barricades, no-trespassing signs, land posted signs or any other indicia of posting on the property." We held that there is no protection under Article 11 for land that is "left unimproved and unbounded." *Id.*

Two other states that have rejected *Oliver* have also specifically required the landowner to take affirmative action to exclude the public from the land. The Oregon Supreme Court held:

> An individual's privacy interest in land he or she has left unimproved and unbounded is not sufficient to trigger the protections of Article I, section 9. Thus, it is not sufficient that the property in question is privately owned, or that it is shielded from view by vegetation or topographical barriers, because those features do not necessarily indicate the owner's intention that the property be kept private. A person who wishes to preserve a constitutionally protected privacy interest in land outside the curtilage must manifest an intention to exclude the public by erecting barriers to entry, such as fences, or by posting signs.

*State v. Dixson*, 766 P.2d 1015, 1024 (Or. 1988) (en banc). In a similar manner, the New York Court of Appeals rejected *Oliver*, but only when the "landowners fence or post 'No Trespassing' signs on their private property or, by some other means, indicate unmistakably that entry is not permitted." *People v. Scott*, 593 N.E.2d 1328, 1338, 583 N.Y.S.2d 920, 930 (1992); see also *People v. Reynolds*, 523 N.E.2d 291, 293, 528 N.Y.S.2d 15, 17 (1988) (owner of land does not have reasonable expectation of privacy in open fields under New York Constitution "where no precautions have been taken to exclude the public from entry").

Although we have not followed the per se rule of *Oliver* in defining the protection given by Article 11, this is not a case in which this difference is of consequence. In the case at bar, the trooper crossed land that was "unimproved and unbounded." Although defendants emphasize the thickness of the woods and

the natural barrier it formed, the same could be said about virtually all uncleared woodland in Vermont in August, the time of the trooper's visit. There is nothing in the facts to distinguish this terrain from that crossed by the officers in *Chester* or in *Kirchoff*. We agree with the Oregon Supreme Court that the shield created by vegetation or topographical barriers fails to demonstrate the landowner's intent to exclude.

 Nonetheless, defendants argue that they took affirmative action to demonstrate their concern for privacy by not clearing the land between the garden and the road. Under this theory, all improved land surrounded by woods becomes protected because the landowner took the step of leaving the woods. Obviously, this is not the kind of affirmative action to exclude the public required by *Kirchoff* and *Chester*. Cf. *State v. Grawien*, 367 N.W.2d 816, 820 (Wis. Ct. App.) (no reasonable expectation of privacy from natural barrier when evidence "does not indicate that any of the foliage which served to partially conceal the marijuana patch was planted by [defendant] or, if so, was cultivated by him for that purpose"), *review denied*, 371 N.W.2d 375 (Wis. 1985). Neither defendants nor prior owners took any affirmative action that would show an intent to exclude the public.

Since, on the facts presented here, the first principle of the federal Fourth Amendment analysis also applies to our state constitutional analysis, defendants can prevail only if we reject the second part of the federal analysis—the right of the officer to look into the curtilage from unprotected open fields. We see no basis in our jurisprudence to adopt this course.

We have necessarily accepted that the trooper in this case could have looked anywhere in the woods for marijuana or evidence of its production. The rule defendants seek would require the trooper to turn his head from observing the garden even though standing in a position from which he could lawfully make an observation and even though defendants have taken no action to shield the garden from view outside the curtilage. In determining what observation is permissible, the trooper would also have to predict the court's decision on the boundaries of the curtilage.

 Our jurisprudence is not consistent with this argument. Since defendants have taken no steps to prevent the public from

reaching the place of observation or to prevent the observation, they have knowingly exposed the garden to the public. See *Katz*, 389 U.S. at 351. Article 11 does not protect "areas willingly exposed to the public." *State v. Savva*, 159 Vt. 75, 89, 616 A.2d 774, 782 (1991); see also *State v. Brooks*, 157 Vt. 490, 493, 601 A.2d 963, 964 (1991) (conversation in parking lot not protected from electronic monitoring when "conversations are subject to the eyes and ears of passersby").

The main point of *Kirchoff* is that a "per se approach cannot be squared with Article 11" in part because "we cannot presume how an individual will employ private lands—that is the nature of privacy." *Kirchoff*, 156 Vt. at 8–9, 587 A.2d at 993; see also *Savva*, 159 Vt. at 87, 616 A.2d at 781 (bright line test of *Oliver* rejected in *Kirchoff* because it fails to do justice to values underlying Article 11). Defendants seek a per se rule that prevents all observation into a curtilage even though they have taken no action to prevent that observation. A per se rule of protection is just as inconsistent with Article 11 as is a per se rule of exclusion.

■ Even if we were to hold that Article 11 prevents observation from outside the curtilage when the landowner has a subjective expectation of privacy, the facts make its application inappropriate here. Not only did defendants do nothing to exclude persons from the walk through the woods on their land as taken by the trooper, they allowed the existence of a path at the point of entry to serve as an invitation for such a walk. The distance traveled by the trooper was very short; in fact, the distance was shorter than the distance between defendants' house and garden. The presence of sheep fencing around the garden, as well as cameras and spotlights, showed that defendants expected the garden to be observed but wanted to prevent theft. In short, the evidence suggests that defendants exhibited no expectation of privacy that we should protect.

*Affirmed.*