2011 VT 111

### State of Vermont v. Rebecca Wetter

[35 A.3d 962]

No. 10-158

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 16, 2011

Motion for Correction Granted September 28, 2011

Motion for Reargument Denied October 10, 2011

478

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Defendant Rebecca Wetter was charged with and convicted of three counts of endeavoring to incite a felony under 13 V.S.A. § 7 and one count of conspiracy under 13 V.S.A. § 1404. The charges were based on allegations that defendant and her daughter Jennifer[1] desired to have defendant's husband killed and asked several mutual friends if they would commit the murder or find someone else who would. Defendant contends that the trial court committed reversible error by allowing a detective to testify regarding the contents of a telephone conversation between defendant and an informant which the detective listened to over a speaker phone with the informant's knowledge. Defendant also claims error in the trial court's failure to instruct the jury on the defense of renunciation under 13 V.S.A. § 1406(1) and (3), and argues that the court abused its discretion when it denied defendant's motion for a new trial based upon newly discovered evidence without holding an evidentiary hearing. We affirm.

¶ 2. In January or February 2007, defendant's daughter Jennifer telephoned her friend Ashley and indicated that defendant

---

[1] Last names of nonparties have been omitted to preserve their privacy.

wanted Ashley's boyfriend Elliot, or someone he knew, to kill defendant's husband. Ashley testified that she knew defendant was present during the telephone call because she could hear her in the background of the conversation. She also testified that defendant herself asked several times whether Elliot would kill her husband or if he could find someone who would do it.

¶ 3. On February 22, 2007, Stephanie, a police informant, met with Detective Robert Estes and told him that defendant and Jennifer "were looking to possibly hire or have someone kill" defendant's husband. According to Stephanie, defendant first told her she wished to have her husband killed in November 2006, and had asked Stephanie if she would do it or if she could find someone to do it. Defendant and Jennifer approached Stephanie about the matter several more times in February 2007. During these conversations, defendant told Stephanie that her husband had a large life insurance policy, that he should be shot on his way home from work, that it should look like an accident, and that Stephanie would have to buy the gun because it would look too suspicious if defendant did.

¶ 4. On February 23, 2007, Detective Estes met with Stephanie again. This time he instructed her to call defendant and tell her that she had someone to use for the murder. Stephanie placed the call with her cell phone on speaker mode. Detective Estes was present and listened to both sides of the conversation. Stephanie did not tell defendant she was on speaker phone.

¶ 5. Evidence of the content of this telephone conversation between defendant and Stephanie was presented at trial through Detective Estes's testimony. He testified that when Stephanie said she might have found a solution for defendant's problem, defendant replied "find one." Later in the conversation, when Stephanie told defendant a solution to her problem had been found, defendant replied "we can't talk about that over the phone." Detective Estes testified that defendant was receptive to the idea of meeting with Stephanie's friend "from the city" about "having this done." The call ended with the understanding that defendant would call Stephanie in a few days so that they could meet with Stephanie's friend.

¶ 6. A few hours after that conversation, defendant called Stephanie to ask if she needed to meet with the friend "from the city" in person. Stephanie phoned Detective Estes to relay the

question and he instructed her to call defendant back and explain that defendant needed to attend the meeting in person.

¶ 7. On February 26, 2007, the day of the scheduled meeting, defendant called Stephanie to say that she was in town but too scared to attend. It was decided that Jennifer would go to the meeting instead.

¶ 8. Stephanie arrived at the appointed meeting location where she saw defendant dropping Jennifer off. Stephanie and Jennifer entered a hotel room together and met with Detective Estes who posed as the hit man. During the forty-five-minute meeting, Jennifer gave Detective Estes a photo of defendant's husband, relayed his work route, outlined the property he owned, and explained that he had a large life insurance policy. Detective Estes quoted the price of the killing to be $20,000, and Jennifer responded that her mother could not make any payment until the husband was killed. The detective asked if anyone else had been contacted regarding the killing, and Jennifer replied that she had spoken with Elliot and Ashley about it. The meeting ended with the parties in agreement that in a few days they would meet with defendant again to discuss further details. Jennifer received a call from defendant before she left the hotel room.[2]

¶ 9. Detective Estes gave Jennifer a ride home from the meeting, and she testified that during this ride she began to suspect he was a police officer. When she arrived home she told defendant that she thought the hit man was a police officer and that the plan was a setup. When asked what happened next, Jennifer testified: "Nothing. Just it — it was over and it ended there, because we realized what we were doing and that it was nothing that we wanted to get ourselves into." Detective Estes testified that when he next spoke with Jennifer and asked how things were looking, she responded that "they were all set as far as needing [his] assistance." The jury found defendant guilty on all four counts.

¶ 10. Defendant contends that the trial court committed reversible error when it allowed Detective Estes to testify as to what he heard during the February 23 phone call between defendant and Stephanie. Defendant claims that under Chapter I, Article 11 of the Vermont Constitution she had a legitimate expectation of

---

[2] This meeting was recorded and that recording was played for the jury during defendant's trial. The jury was also given a transcript for reference.

privacy as to the contents of that call and therefore the exclusionary rule precluded Detective Estes from testifying about what he overheard.

¶ 11. "An Article 11 search occurs when the government intrudes into areas or activities that are the subject of legitimate expectations of privacy." *State v. Bryant*, 2008 VT 39, ¶ 11, 183 Vt. 355, 950 A.2d 467 (quotations omitted). "Under Article 11, the question of whether an individual has a legitimate expectation of privacy hinges on the essence of underlying constitutional values — including respect for *both* private, subjective expectations and public norms." *Id.* (quotations omitted). Thus, "in order to invoke Article 11 protection, a person must exhibit an actual (subjective) expectation of privacy that society is prepared to recognize as reasonable." *Id.* (quotations and alterations omitted).

¶ 12. When determining whether a person has a subjective expectation of privacy, we often look to his or her actions for circumstantial evidence of an expectation of privacy. In *State v. Rogers*, for example, the defendants argued that the visual observation of their garden by a state trooper acting on a tip that defendants were cultivating marijuana was an illegal search under the Vermont and Federal Constitutions and thus could not support a finding of probable cause for the issuance of a search warrant. 161 Vt. 236, 238, 638 A.2d 569, 570-71 (1993). In addressing the question of whether the defendants had a subjective expectation of privacy we looked to the actions they had taken to secure the privacy of the property. We noted that the defendants had done nothing to exclude persons from walking through woods on their land as the trooper had, that "they allowed the existence of a path at the point of entry to serve as an invitation for such a walk," and that "the distance traveled by the trooper [along the path to see the garden] was very short." *Id.* at 249, 638 A.2d at 577. Based on these facts we concluded that the defendants had not exhibited a subjective expectation of privacy despite the fact that they had installed cameras, spotlights, and sheep fencing around the garden. *Id.* We explained that these actions did not demonstrate a subjective expectation of privacy; rather they demonstrated that the defendants "expected the garden to be observed but wanted to prevent theft." *Id.*

¶ 13. In the present case, defendant's actions regarding the disclosures she made over the telephone likewise fail to demon-

strate a subjective expectation of privacy. When Stephanie stated that she had found a solution to defendant's problem, defendant replied "we can't talk about that over the phone." While defendant's comment demonstrated she did not want to get caught speaking about the crime, it also demonstrated that she did not expect the telephone conversation to be private.

■ ¶ 14. The Massachusetts Supreme Judicial Court has addressed the question of officer testimony and warrantless eavesdropping. While not binding, we find its analysis instructive. In *Commonwealth v. Eason*, a witness claimed to know that the defendant had been involved in a home invasion. 694 N.E.2d 1264 (Mass. 1998). At the direction of police officers, the witness made two calls to the defendant at his home. Without the defendant's knowledge but with the witness's consent, the police officers listened to these calls on an extension telephone. They later testified at trial to admissions they heard the defendant make during those telephone conversations. *Id.* at 1265. The defendant challenged the officers' testimony under the Massachusetts Constitution.[3] The Massachusetts Supreme Judicial Court distinguished the situation from one of its past precedents in which it had held that the state Constitution protected a defendant's reasonable expectation that there would be no warrantless eavesdropping on his in-home conversations from a crawl space under his first-floor apartment. *Id.* at 1266 (citing *Commonwealth v. Panetti*, 547 N.E.2d 46 (Mass. 1989)). The court explained that while it is "reasonable to expect that conversational interchange in a private home will not be invaded surreptitiously by warrantless electronic transmission or recording," the conversation did not occur entirely in a private home. *Id.* at 1267. "The defendant knew, when speaking on the telephone, that his words were being transmitted electronically beyond his home . . . [and thus] he had

---

[3] The Massachusetts and Vermont Constitutions have been interpreted similarly with regard to the standards used to determine whether a person has a constitutionally protected expectation of privacy. See Vt. Const. ch. I, art. 11, ann. 16 (citing *State v. Morris*, 165 Vt. 111, 115, 680 A.2d 90, 94 (1996) ("In determining whether persons have a privacy interest in any given area or activity, we examine both private subjective expectations and general social norms."); cf. *Eason*, 694 N.E.2d at 1267 (When addressing the question of unreasonable searches and seizures under the Massachusetts Constitution, the court must ask "whether the defendant had a subjective expectation of privacy in the object of the challenged search that society is willing to recognize as reasonable.").

no reason to assume the conversation would not be heard by a third party. A person cannot control the conditions at the other end of a telephone conversation." *Id.* at 1267-68.

¶ 15. We find this analysis persuasive. While a person may have a reasonable expectation that face-to-face conversations with another person in his or her own home are not being broadcast outside the home, we do not believe that a person who broadcasts his or her own conversation to those outside the home without knowledge of the circumstances at the other end of the conversation has an expectation of privacy in that conversation that society would deem reasonable. Defendant has not shown that she had a subjective expectation of privacy in her telephone conversation with the informant. Detective Estes did not require a warrant to monitor the conversation, and admission of his testimony was proper.

¶ 16. Defendant also argues that the court committed reversible error when it declined to instruct the jury on the defense of renunciation under 13 V.S.A. § 1406(1) and (3) because defendant stated that she would desist from making any further efforts toward the crime and had made a timely, positive statement to the other party to the conspiracy that she would not pursue the murder. At trial, defendant requested an instruction on the renunciation defense, arguing that the defense was supported by defendant's statements to Elliot and Jennifer's statements to Detective Estes. The trial court denied this request and concluded that the record evidence did not support the instruction.

¶ 17. A defendant is entitled to a jury instruction on a defense when he or she can make out a prima facie case on each element of the defense. *State v. Knapp*, 147 Vt. 56, 59, 509 A.2d 1010, 1011 (1986). The trial court has a duty to instruct the jury on all such material points. *Id.* at 58-59, 509 A.2d at 1011. The controlling statute, 13 V.S.A. § 1406, reads in relevant part:

> It is a defense to a prosecution under this chapter that the defendant renounced his or her criminal purpose by:

>> (1) conduct designed to prevent the commission of the crime agreed upon; or

>> . . . .

> (3) making a timely, positive statement to one or more of the other parties to the agreement that the defendant will not participate in the crime.

¶ 18. This Court has not had occasion to interpret the renunciation defense provided in § 1406. Nevertheless, defendant's statements do not fall within the statute because, even by the most generous interpretation, they evidence a mere change in plans.[4] Furthermore, the very aims of the renunciation defense — avoiding punishing nondangerous people and discouraging defendants from carrying out their crimes — are not met by allowing defendant use of the defense. See *Commonwealth v. Nee*, 935 N.E.2d 1276, 1284-85 (Mass. 2010) (analyzing Model Penal Code renunciation defense). Here, defendant's statements do not indicate that she became nondangerous. In addition, Jennifer told Detective Estes that she and defendant did not need his services because they believed he was a police officer and they were scared of getting caught. Defendant did not reject his services because she was otherwise discouraged or had a change of heart.

¶ 19. Defendant's statements to Elliot also do not support a renunciation defense. Elliot testified that after the police had questioned him about the possibility of a plot to kill defendant's husband, he met defendant, Jennifer, and another person at a bar in Burlington, where he told defendant "how I felt, you know, when the cops came to me about it, I was really mad, so I was just expressing it. She's like no, it's all done. I think she was saying like my husband thought I was trying to do something to him and I don't know why and I'm just not — you know."

¶ 20. We agree with the trial court that defendant's statements to Elliot were not a renunciation of prior statements of criminal purpose. They do not tend to show that defendant no longer wanted her husband killed, nor do they show that defendant no longer planned to participate in the crime. "It's all done" could

---

[4] One federal district court has held a similar state statute to be inapplicable in cases where the defendant's statements to co-conspirators "only demonstrate a change in plans" and do not show that defendant renounced the conspiracy. *United States v. Williams*, No. 1:06CR424, 2007 WL 1306592, at *7 (N.D. Ohio May 3, 2007) (holding no defense where defendant changed plans to kill targeted victims himself, rather than hiring someone); Ohio Rev. Code Ann. § 2923.01(I)(2) (providing defense to conspiracy where defendant advises "all other conspirators of the actor's abandonment").

indicate that defendant no longer wanted her husband killed or it could indicate that defendant had taken care of the matter by hiring someone else. The statement is not "designed to prevent the commission of the crime," nor is it a timely, positive statement that defendant would not participate in the crime. At most it seems to show that defendant was trying to calm Elliot down and assure him that he was no longer required to participate.

¶ 21. As for Jennifer's statements to Detective Estes, Detective Estes testified that after his initial meeting with Jennifer, he had made a follow-up call to defendant's cell phone. Jennifer answered and Detective Estes "asked her how things were basically looking," to which she replied "they were all set." Detective Estes testified that Jennifer went on to make "reference, I believe, to the fact that they had gotten back together. And I took that to be [defendant] and [her husband]. And that they said they weren't — they were all set as far as needing my assistance."

¶ 22. Preliminarily, Jennifer — not defendant — made these statements to Detective Estes, and thus we question whether defendant can point to them as evidence of her renunciation under the statute. Further, Jennifer said only that she and her mother had no more need for Detective Estes, not that they no longer planned to kill defendant's husband. Finally, because other evidence demonstrated that at the point of this conversation defendant and Jennifer already suspected that Detective Estes was a police officer, cancellation of his services does not necessarily demonstrate an unwillingness to go forward but rather a desire not to get caught. Thus we find no error in the trial court's ruling.

¶ 23. Finally, defendant contends that the court abused its discretion when it denied her motion for a new trial based upon newly discovered evidence without holding an evidentiary hearing. The motion was filed on the day scheduled for defendant's sentencing hearing and offered as new evidence that Jennifer had made "exculpatory statements" to defendant's sister Roxanna. In a sworn statement, defendant's sister stated that Jennifer had said she planned to testify against defendant and blame defendant for trying to kill her husband in order to keep custody of her child.

¶ 24. A motion for a new trial under Vermont Rule of Criminal Procedure 33 "is a matter for the discretion of the trial court and, absent a showing of abuse or the withholding of discretion, its

decision will not be reversed." *State v. Mecier*, 145 Vt. 173, 181, 488 A.2d 737, 742 (1984).

 ¶ 25. If the motion is based on newly discovered evidence,

(1) it must be material and have been discovered since the trial, (2) it must be truly new and not merely undiscovered because of lack of diligence, (3) it must be of such character that it will give reasonable assurance that it will work a different result upon a retrial, and (4) it must not be merely cumulative or only of impeaching effect.

*Id.* "[W]hen requested, an evidentiary hearing should be granted on a [Rule] 33 motion for new trial based on newly discovered evidence, if the grounds relied upon are stated with particularity, and the motion is neither frivolous nor totally lacking in merit." *State v. Unwin*, 142 Vt. 562, 565, 458 A.2d 1107, 1109 (1983).

██ ¶ 26. The trial court dismissed defendant's motion, stating that "[t]he 'newly discovered evidence' [wa]s mere impeaching," thus finding the evidence failed under prong (4) of *Mecier*. We agree. On its face, Roxanna's testimony merely offers a reason for Jennifer to fabricate her testimony; it does not show that the testimony was in fact false.[5] Further, while this evidence acts to impeach Jennifer's testimony, most of the evidence of defendant's conspiracy against her husband was entered via the testimony of others, namely the two men she asked to kill her husband, Detective Estes and Elliot, and police informant Stephanie. The "new evidence" has no bearing on whether any of these witnesses would have had reason to lie about defendant's actions. Thus, even had this evidence been allowed, it had no tendency to show a probable change in the outcome of the jury's deliberations and thus it fails on prong (3) as well. We agree with the trial court that the request for a new trial was lacking in merit and conclude

---

[5] Additionally, defendant's argument fails on prong (2) of *Mecier* because she failed to plead sufficient facts to show that the information in Roxanna's testimony could not have been discovered through reasonable diligence. The motion mentioned that defendant and her sister were estranged. However, defendant and Jennifer lived in an apartment owned by defendant's sister. Defendant has pleaded no facts which show that she ever tried to contact her sister for trial.

that lower court did not abuse its discretion when it declined to hold a hearing and denied the motion for a new trial.

*Affirmed.*