2013 VT 13



State v. Bogert (2011-253)

 

2013 VT 13

 

[Filed 22-Feb-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 13
 
  


 No. 2011-253
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Franklin Unit,
 
 
  
 
 
 Criminal Division
 
 
  
 
 
  
 
 
 Thomas Bogert, Jr.
 
 
 October Term, 2012
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 A. Gregory
 Rainville, J. (motions to suppress and dismiss); Mark J. Keller (final
 judgment)
 
 
  
 
 Diane C. Wheeler, Franklin County Deputy State’s Attorney,
St. Albans, for Plaintiff-Appellee.

 

Allison N. Fulcher of Martin &
Associates, Barre, for Defendant-Appellant.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund, Burgess and
Robinson, JJ.

 

 

¶ 1.            
ROBINSON, J.   This case tests the permissibility,
under the Vermont Constitution, of a warrantless and suspicionless search of a
convicted offender furloughed to his home and subject to a standard condition
of a conditional reentry agreement that provides for such searches.  We
conclude that the search in this case satisfied the requirements of the Vermont
Constitution applicable to offenders on a conditional reentry status and,
accordingly, affirm.

¶ 2.            
In January 2005, defendant Thomas Bogert pleaded guilty to two counts of
possession of child pornography and no contest to one count of aggravated
sexual assault and one count of sexual assault.  He was sentenced to a
total of three to twenty-three years, eight years to serve, with the balance
suspended.  Defendant signed a probation order that included thirty-five
conditions.  One of defendant’s special conditions, Condition # 38,
said:

You
shall not possess or utilize any computer that has [internet] access without
prior approval of your PO and supervised by a person approved by your PO. 
If your PO approves any use of a computer with internet access as described
above, that computer and any related media will be subject to periodic
inspection to assure compliance with your conditions of probation.  

 

¶ 3.            
In February 2007, defendant admitted to violating his probation after
testing positive for cannabinoids; at the sentencing hearing for the violation
of probation (VOP), the court maintained defendant’s probation conditions and
added a condition that he not possess any pornography
in his home.  

¶ 4.            
In July 2007, defendant signed a Terms of Release/Supervision agreement
with the Department of Corrections (DOC) allowing him to serve the remainder of
the incarcerative portion of his split sentence in the community on a
conditional reentry status.  The agreement contained the following
standard condition: “I agree to submit my person, place of residence, vehicle
or property to a search at any time of the day or night by the department of
corrections staff.”  

¶ 5.            
In March 2009, two community correctional officers from DOC and a State
Trooper conducted a “sex offender compliance check” at defendant’s home and
collected evidence from computers that demonstrated a violation of the terms of
his conditional release and the terms of his probation.  The DOC took
defendant into custody and suspended his conditional reentry status.  In
addition, the State issued a probation violation complaint against defendant
for violating the probation conditions prohibiting possession or use of a
computer with internet access without prior approval and prohibiting possession
of any pornography, adult or otherwise.  

¶ 6.            
Defendant filed a motion to dismiss the probation violation complaint
and a motion to suppress the evidence gathered in the search of defendant’s
home.  In particular, defendant sought dismissal of the probation
violation complaint on the grounds that the underlying probation conditions
were unconstitutionally overbroad, vague, and unrelated to his
conviction.  With respect to the suppression issue, defendant argued that
the search of his residence was involuntary and unreasonable pursuant to both
the United States and Vermont constitutions.  See U.S. Const. amend. IV; Vt. Const. ch. I, art. 11.  

¶ 7.            
The court denied the motion to dismiss because it found that it was an
impermissible collateral challenge to defendant’s unappealed probation
conditions.  See State v. Austin, 165 Vt. 389,
402, 685 A.2d 1076, 1084-85 (1996).  The court also denied
defendant’s motion to suppress on the grounds that defendant’s status on
conditional reentry made “his residence effectively . . . his prison
cell,” and the search pursuant to DOC guidelines complied with the requirements
for conducting routine, random, warrantless searches of inmates’ cells. 
See  State v. Berard, 154 Vt. 306,
576 A.2d 118 (1990).  Defendant appeals the trial court’s denial of his
motion to suppress.

¶ 8.            
 “On appeal of a motion to suppress, we review the trial court’s
legal conclusions de novo and its factual findings for clear error.”  State
v. Paro, 2012 VT 53, ¶ 2, ___ Vt. ___, 54 A.3d 516. 


I.

¶ 9.            
First, we consider defendant’s argument under the Fourth Amendment to
the U.S. Constitution.  The U.S. Supreme Court has recognized exceptions
to the general rule that searches must be undertaken “only pursuant to a
warrant (and thus supported by probable cause . . .)” in certain
categories of searches in which “special needs, beyond the normal need for law
enforcement, make the warrant and probable-cause requirement
impracticable.”  Griffin v. Wisconsin, 483 U.S.
868, 873 (1987) (quotation omitted).  Accordingly, the Court has
allowed warrantless, work-related searches by supervisors of government
employees’ desks and offices without probable cause and warrantless searches by
school officials of some student property without probable cause.  Id. 
The Court has also held that “in certain circumstances government investigators
conducting searches pursuant to a regulatory scheme need not adhere to the
usual warrant or probable-cause requirements as long as their searches meet
‘reasonable legislative or administrative standards.’ ” 
Id. (quoting Camara v. Municipal Court, 387 U.S. 523, 538
(1967)).

¶ 10.         In Griffin,
the Supreme Court considered a warrantless search of a probationer conducted by
probation officials pursuant to an administrative regulation allowing probation
officers to search a probationer’s home without a warrant as long as there are
“reasonable grounds” to believe contraband is present.  Id.
at 870-71.  The Court acknowledged that “[a] State’s operation of a
probation system, like its operation of a school, government office or prison,
or its supervision of a regulated industry, likewise presents ‘special needs’
beyond normal law enforcement that may justify departures from the usual
warrant and probable-cause requirements.”  Id. at
873-74.  The Court noted that probation was on “a continuum of
possible punishments ranging from solitary confinement in a maximum-security
facility to a few hours of mandatory community service,” and identified a
number of different options between those extremes, “including confinement in a
medium- or minimum-security facility, work-release programs, ‘halfway houses,’ and
probation—which can itself be more or less confining depending upon the number
and severity of restrictions imposed.”  Id. at
874.  The Court recognized that probationers, like parolees, “do
not enjoy ‘the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent
on observance of special [probation] restrictions.’ ” 
Id. (quoting Morrissey v. Brewer, 408 U.S. 471, 480
(1972)).  Those restrictions are designed to promote the rehabilitative
goals of probation, and to ensure that the community is not harmed by the
probationer’s being at large—goals that justify the exercise of supervision to
ensure compliance with the restrictions.  Id. at
875.  

¶ 11.         Given
these considerations, the Court concluded that supervision “is a ‘special need’
of the State permitting a degree of impingement upon privacy that would not be
constitutional if applied to the public at large.”  Id.  The
Court recognized that a state’s ability to impinge a probationer’s privacy is
not unlimited, but relying on a “special-needs” analysis, the Court approved
the search that had been conducted by probation officials pursuant to a state
regulation that authorized warrantless searches of probationers upon reasonable
grounds.  Id. at 880. 

¶ 12.         The
Court subsequently considered the constitutionality of a warrantless search of
a probationer’s home by a law enforcement officer that was not conducted
pursuant to a probation supervision scheme as in Griffin.  United States v. Knights, 534 U.S. 112 (2001). 
The defendant in Knights had signed a probation condition that required
him to “[s]ubmit his . . . person, property, place of residence,
vehicle, personal effects, to search at anytime, with or without a search
warrant, warrant of arrest or reasonable cause by any probation officer or law
enforcement officer.”  Id. at 114. 
The Court did not extend the “special needs” rationale relied upon in Griffin,
but instead applied a “general Fourth Amendment approach of examining the
totality of the circumstances, with the probation condition being a salient
circumstance.”  Id. at 118 (quotation and
citation omitted).  The Court determined that it was reasonable to
conclude that the search condition would further the goals of rehabilitation
and protecting society that it had identified in Griffin, and stressed
that the clear and unambiguous probation condition “significantly diminished
[the defendant’s] reasonable expectation of privacy.”  Id.
at 119-20.  Balancing the defendant’s privacy rights against the
state’s legitimate interests, the Court concluded that the Fourth Amendment
required no more than a reasonable suspicion for a search of the probationer’s
home.  Id. at 121.  Because the state
undisputedly had reasonable suspicion to support the search, the Court
expressly declined to decide the question of whether the probation condition
purporting to allow for a suspicionless search was constitutional. 
Id. at 120 n. 6.

¶ 13.         Five
years later, in Samson v. California, 547 U.S. 843 (2006), the Court
considered the constitutionality of a suspicionless search—this time of a
parolee.  A police officer stopped the defendant in the street and,
knowing him to be on parole, conducted a warrantless search.  Id. at 846-47.  California law required, as a
condition of parole, that parolees “agree in writing to be subject to search or
seizure by a parole officer or other peace officer at any time of the day or
night, with or without a search warrant and with or without cause.”  Id. at 846 (quotation omitted).  

¶ 14.         The
U.S. Supreme Court considered the totality of the circumstances “to determine
whether [the] search [was] reasonable within the meaning of the Fourth
Amendment.”  Id. at 848.  With
respect to the defendant’s interests, the Court said that “on the continuum of
state-imposed punishments . . . parolees
have fewer expectations of privacy than probationers, because parole is more
akin to imprisonment than probation is to imprisonment.”  Id. at 850 (quotation omitted).  The Court
explained, “[P]arole is an established variation on imprisonment of convicted
criminals.  The essence of parole is release from prison, before the
completion of sentence, on the condition that the prisoner
abide by certain rules during the balance of the sentence.”  Id. (quotation and alteration omitted).  The
Court cited the First Circuit favorably for the proposition that “ ‘on the . . . continuum of possible
punishments, parole is the stronger medicine; ergo, parolees enjoy even less of
the average citizen’s absolute liberty than do probationers.’ ”  Id. (quoting United States v. Cardona,
903 F.2d 60, 63 (1st Cir. 1990)).  Reviewing a litany of restrictions on
liberty applicable to parolees outside of custody—from limitation on travel to
reporting requirements concerning changes in employment—the Court reasoned that
“[t]he extent and reach of these conditions clearly demonstrate that parolees
like petitioner have severely diminished expectations of privacy by virtue of
their status alone.”  Id. at 852. 
The Court pointed to defendant’s acceptance of the search condition as a
critical factor and concluded that the defendant “did not have an expectation
of privacy that society would recognize as legitimate.”  Id.  

¶ 15.         On
the other side of the balance, the Court found the state had an “overwhelming
interest” in supervising parolees because, as demonstrated by the nearly 70%
recidivism rate of California parolees, “parolees are more likely to commit
future criminal offenses.”  Id. at 853-54
(quotation and alteration omitted).  The Court focused on the
state’s interest in “reducing recidivism and thereby promoting reintegration
and positive citizenship among probationers and parolees.”  Id. at 853.  The Court accepted that “given the
number of inmates the State paroles and its high recidivism rate, a requirement
that searches be based on individualized suspicion would undermine the State’s
ability to effectively supervise parolees and protect the public from criminal
acts by reoffenders” by affording those parolees a greater opportunity to
“anticipate searches and conceal criminality.”  Id.
at 854.  In light of the above, the Court concluded that the Fourth
Amendment does not prohibit a police officer from conducting a suspicionless
search of a parolee.  Id. at 857.

¶ 16.         In
light of Samson, defendant’s federal constitutional claim is doomed to
fail.  His Fourth Amendment expectation of privacy, given his conditional
reentry status subject to the agreed-upon condition that he submit to a search
at any time, is no greater than that of the defendant in Samson, and the
State’s supervision goals are no weaker than those of California. 
Accordingly, we reject defendant’s Fourth Amendment challenge to the search in
this case.

II.

¶ 17.         Two
decisions bookend our analysis under Article 11 of the Vermont Constitution.*
 At one end of the spectrum is our decision in Berard, 154 Vt. 306,
576 A.2d 118, relied-upon by the trial court in concluding that the search here
was appropriate.  In that case, we concluded that a “routine and random
warrantless search of a defendant’s prison cell, conducted without probable
cause or any quantum of particularized suspicion,” did not violate the
defendant’s rights under Article 11.  Id. at 307, 576 A.2d at 119.  At the outset, we reaffirmed that,
although “[t]he language of Article Eleven does not expressly limit its
protection to ‘unreasonable’ searches and seizures” like the Fourth Amendment
to the U.S. Constitution, we have “consistently interpreted Article Eleven as
importing the ‘reasonableness’ criterion of the Fourth Amendment.”  Id.
at 309, 576 A.2d at 120.  We also made it clear,
though, that the requirements of Article 11 do not necessarily track those of
the Fourth Amendment.  Id. at 310-11, 576 A.2d at
120-21.  

¶ 18.         We
reviewed the U.S. Supreme Court’s conclusion that “ ‘prisoners have no
legitimate expectation of privacy and that the Fourth Amendment’s prohibition
on unreasonable searches does not apply in prison cells,’ ” and concluded
that the Court had established a “ ‘bright line’ rule” that was based upon
“implicit, fixed assumptions about the nature of prison life and prison
administration that override the facts of particular cases and remove from the
courts the critical job of reviewing the facts.”  Id. at 310, 576
A.2d at 120 (quoting Hudson v. Palmer, 468 U.S. 517, 530 (1984)). 
In construing Article 11, in contrast, we emphasized that the drafters of
Article 11 “vested responsibility and authority in the judiciary to review and
restrain overreaching searches and seizures by the government,” and rejected an
approach that would “derogate the central role of the judiciary in Article
Eleven jurisprudence.”  Id. (quotation omitted). 

¶ 19.         Distinguishing
our Article 11 standard from that of the Fourth Amendment, we held that this
Court would depart from the warrant and probable-cause requirements “only in
those exceptional circumstances in which special needs, beyond the normal need
for law enforcement, make the warrant and probable-cause requirement
impracticable.”  Id. at 310-11, 576 A.2d at
120-21 (quotation and alteration omitted).  In such cases, using a
balancing test, we would “then try to identify a standard of reasonableness,
other than the traditional one, suitable for the circumstances.”  Id. at 311, 576 A.2d at 121 (quotation omitted). 
We cautioned, however, that “[t]he warrant and probable-cause requirements . . . continue to serve as a model in
the formulation of [a] new standard.”  Id. (quotation
omitted).  

¶ 20.         Considering
the specific issue before us in that case—warrantless searches of prison
cells—we concluded that the State had met its threshold burden of demonstrating
a special need requiring departure from the ordinary warrant requirement. 
Id. at 312, 576 A.2d at 121.  We pointed
to the objectives in a prison environment of “guarding against drugs and other
contraband, like illicit weapons, thwarting escape, and maintaining a sanitary
and healthful environment.”  Id. at 312, 576 A.2d
at 122.  Turning to the balancing test, we identified three factors
central to our analysis of the permissibility of a random search of a prison
cell: (1) the establishment of clear, objective guidelines by a high-level
administrative official; (2) the requirement that those guidelines be followed
by implementing officials; and (3) no systematic singling out of inmates in the
absence of probable cause or articulable suspicion.  Id. at 314, 576 A.2d at 122.  Because the State had established
that the search was conducted pursuant to a written plan that was not
unreasonable and that the plan was followed during the search, and because the
defendant did not show any particular pattern of arbitrary conduct or
particularized unfairness in the conduct of the search, we concluded that the
random search of the inmate’s cell did not violate his “residuum of privacy
rights.”  Id. at 313, 317-18, 576 A.2d at 122,
124.

¶ 21.         We
applied Article 11 close to the other end of the “continuum of state-imposed punishments”
in State v. Lockwood.  160 Vt. 547, 632 A.2d 655
(1993).  In that case, probation officials who had “reasonable
grounds” conducted a warrantless search of the private quarters of an
offender.  The defendant’s probation conditions allowed for such a
search.  We reviewed the U.S. Supreme Court’s decision in Griffin
and concluded that, although the probation officer in Lockwood acted
pursuant to a probation condition rather than a state regulation, the Griffin
framework applied to our Fourth Amendment and Article 11 analyses because “when
probation conditions are supported by the findings and are narrowly tailored to
fit the circumstances of the individual probationer[,] probation searches based
on reasonable suspicion can have the same indicia of reasonableness as the
search upheld in Griffin.”  Id. at 556,
632 A.2d at 661 (quotation and alterations omitted).  In Lockwood,
we found that the probation condition in question was supported by the
findings—the defendant was uniquely at risk of reoffending given his own
history of abuse, his developmental delay, and his demonstrated
compulsions.  Id. at 557, 632 A.2d at 662. 
We likewise reasoned that the court’s expressed concerns regarding the
defendant’s compulsive sexual urges provided sufficient guidance to the
officers conducting the search to meet the requirement that the condition be
narrowly tailored to fit the circumstances of the individual probationer. 
Id. at 558, 632 A.2d at 662.

¶ 22.         Significantly,
in Lockwood we noted that the probation condition as actually
written—such that it purported to allow a warrantless and suspicionless search
of defendant’s home—was invalid.  We concluded that the absence of a
“reasonableness” limitation in the probation condition was not objectionable
“so long as the decision to search was in fact narrowly and properly made on
the basis of reasonable suspicion.”  Id.
(quotation and alteration omitted).

¶ 23.         Given
that we have previously acknowledged such special needs across the corrections
continuum—from incarceration to probation—we have no problem concluding that a
special need applies in the context of a convicted sex offender released into
the community on conditional reentry.  

¶ 24.        
The more difficult question is how to balance the competing state and
individual interests in this case.  Is the trial court correct that
conditional reentry is sufficiently analogous to actual incarceration that the
three-factor test we applied in Berard—a test that does not require
individualized reasonable suspicion—strikes the most reasonable balance between
individual privacy interests and the State’s own important goals?  

¶ 25.        
Is the status of conditional reentry more akin to probation such that
reasonable suspicion is a prerequisite to a search?  See Green v. State,
719 N.E.2d 426, 430 (Ind. Ct. App. 1999) (“Generally, work release is
. . . more restrictive . . . than probation since work
release participants are actually jail inmates who must return to the jail when
not working . . . . Nevertheless, an inmate who has been
released for work closely resembles a probationer. . . .
Therefore, a condition of work release that purports to require a participant
to submit to a search or seizure without reasonable suspicion is overly broad.”);
People v. Woods, 535 N.W.2d 259, 261 n.2.
(Mich. Ct. App. 1995) (“In light of defendant’s status as a prisoner within the
[community residential program (CRP)], an argument can be made that his
expectation of privacy is even less than that of a probationer or parolee. 
However, we believe that placement in the CRP should be found to be analogous
to parole; in both situations, the prisoner has demonstrated, through his
behavior, that he is not required to remain in prison.”).  

¶ 26.        
Or, because it falls between these points on the spectrum, does
defendant’s status call for a different analysis altogether?  See  Kopkey
v. State, 743 N.E.2d 331, 336-37 (Ind. Ct. App. 2001) (“On the ‘continuum
of possible punishments’ . . . in-home detention lies somewhere between
incarceration and probation, where as here in-home detention is through a
direct commitment to community corrections as opposed to being a condition of
probation.”).  

¶ 27.        
From the perspective of the State’s interests, it is difficult to distinguish
conditional reentry status from probation.  In both settings, the State’s
interests in rehabilitation and reduction of recidivism, as well as in public
protection, provide the rationale for departing from the ordinary requirement
of probable cause and a warrant.  The burden of a reasonable suspicion
requirement would seem to weigh equally on the State in the two contexts. 
On the other hand, the unique obstacles a “reasonable suspicion” requirement
would impose on the State’s efforts to “guard[] against
drugs and other contraband, like illicit weapons, thwart[] escape, and
maintain[] a sanitary and healthful environment” in a corrections facility are
not as clear in a situation in which the offender is at home.  Berard,
154 Vt. at 312, 576 A.2d at 122.

¶
28.        
From the perspective of defendant’s interests and reasonable expectation
of privacy, his circumstances, superficially, may look very similar to that of
a probationer.  An offender on conditional reentry status may be free to
leave home and to work in the community.  Agency of
Human Services Department of Corrections Directive 371.15 & Conditional
Re-entry, Attachment A, Terms of Release (Mar. 28, 2008), available at
http://www.doc.state.vt.us/about/ policies/rpd/correctional-services-301.550/corr_services.
 By the same token, many probationers are subject to the same kinds of
restrictions as those on conditional reentry—including drug and alcohol
testing, reporting, and controlled travel.  Compare id.,
with 28 V.S.A. § 252 (providing standard probation conditions). 
However, one critical difference distinguishes a probationer (or parolee) from
an individual furloughed in a program of conditional reentry:  In contrast
to a probationer, an individual on furlough has no statutorily or constitutionally
protected right to remain on conditional reentry status, and is subject to
reincarceration at the discretion of the Commissioner of Corrections with no
due process protections.  See 28 V.S.A. § 808(c) (“The extension of
the limits of the place of confinement . . . shall in no way be
interpreted as a probation or parole of the offender, but shall constitute
solely a permitted extension of the limits of the place of confinement for
offenders committed to the custody of the commissioner.”); Conway v. Cumming,
161 Vt. 113, 119, 636 A.2d 735, 738 (1993) (furloughee has no
constitutionally-protected liberty interest nor statutorily protected interest
in furlough status and Commissioner of Corrections can revoke furlough status
without hearing).  In Conway, we described an offender’s status
under furlough as most closely resembling “that of an inmate seeking a
particular right or status within an institution, rather than that of a
parolee,” and we noted that in contrast to a parolee, an individual on furlough
is still “in lawful custody” for the purposes of the crime of escape.  Id. at 116 & n.3, 636 A.2d at 737 & n.3 (quotation
omitted).  

¶ 29.        
Although this distinction speaks to the respective due process rights of
individuals on furlough as contrasted with those of probationers or parolees,
rather than their respective Article 11 rights, there is a connection:
 The scope of an offender’s reasonable expectation of privacy in the home,
when he or she can be returned to a correctional facility at the discretion of
the Commissioner of Corrections, is not as extensive as that of a
probationer.  It would be odd to suggest that an individual on furlough is
subject to being seized and returned to prison with no process, but cannot be
held to an agreement to conditions of reentry that allow for the lesser
intrusion of a random search.  Cf. State v. Wetter, 2011 VT 111,
¶ 11, 190 Vt. 476, 35 A.3d 962 (“[I]n order to
invoke Article 11 protection, a person must exhibit an actual (subjective)
expectation of privacy that society is prepared to recognize as reasonable.” (quotation omitted)).

¶ 30.        
On the basis of these considerations, we conclude that the trial court
did not err in applying the framework we articulated in Berard, rather
than a reasonable-suspicion standard along the lines of Lockwood.  

¶ 31.        
As noted above, in Berard we considered the establishment of
clear, objective guidelines by a high-level administrative official, the
requirement that the guidelines be followed, and the absence of singling-out of
particular individuals without probable cause or articulable suspicion as
critical factors in upholding the random search of an inmate’s cell.  154
Vt. at 314, 576 A.2d at 122.  Defendant argues
that even if the Berard framework applies, the trial court failed to
determine that the search of defendant’s house was a random compliance check as
required, and did not make any finding that defendant was not singled out.

¶ 32.        
Defendant raises this argument for the first time on appeal; before the
trial court, defendant argued for suppression solely on the legal basis that a
search without reasonable suspicion violated Article 11, and did not offer or
request an evidentiary hearing on the question of whether the “sex offender
compliance check” that gave rise to the disputed search satisfied the criteria
we articulated in Berard.  Had defendant argued below that the
search also failed to meet the criteria of a permissible random search pursuant
to Berard, the trial court would have been prompted to take evidence and
to make findings addressing that argument.  This is precisely the reason
we do not address arguments on appeal that were not raised below.  Bull
v. Pinkham Eng'g Assocs., Inc., 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) (“Contentions not raised or fairly presented to the trial
court are not preserved for appeal.”)

Affirmed.

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











*  Article 11
states: “That the people have a right to hold themselves, their houses, papers,
and possessions, free from search or seizure; and therefore warrants, without
oath or affirmation . . . ought not to
be granted.”  Vt. Const. ch. I, art. 11.