NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 119

No. 2015-165

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Cameron Albarelli | May Term, 2016 |

Michael S. Kupersmith, J.

Thomas J. Donovan, Jr., Chittenden County State's Attorney, and Pamela Hall Johnson, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Joshua O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **SKOGLUND, J.**  Defendant Cameron Albarelli appeals his convictions following a jury trial in the Superior Court, Chittenden Unit, Criminal Division.  Defendant asks this Court to reverse his convictions of simple assault, disorderly conduct, and providing false information to a police officer.  He also challenges various conditions of his probation.  We affirm defendant's convictions and a number of defendant's probation conditions, but strike several probation conditions, and remand.

I.  Factual Background

¶ 2.    This case arises from a fight involving two groups of men that occurred on July 18, 2013, around midnight at the north end of Church Street in Burlington.  As a result of the altercation, defendant was charged with simple assault, disorderly conduct, and giving false

information to a police officer with the intent to deflect the investigation. At his jury trial on February 3, 2015, the State presented several witnesses to prove the charges, including the complainant, two eye witnesses socializing with defendant's group, one eye witness that was unaffiliated with either of the parties, and the officer who assisted with the arrest. The witnesses described the events on the night of July 18 as follows.

¶ 3.    That night, the complainant, his brother, and four other friends were bar hopping on Church Street to celebrate the complainant's brother's wedding, which was the following day. After a drink at a bar on Pearl Street at the north end of Church Street, the bachelor party intended to move back south on Church Street to visit another bar. While they were walking, the complainant's party observed what was described as "not a friendly conversation" between an older man sitting alone on a bench and a group of five people.

¶ 4.    Defendant was part of that group. According to trial testimony, he and four friends—two male and two female—were walking north on Church Street when the older man said something to the group and, in response, defendant and his two male friends yelled at and threatened the man.

¶ 5.    Observing this argument, the complainant's party suggested that the three men, including defendant, leave the man alone. They were told to mind their business. Words were exchanged between the two groups until defendant "freaked out" and attacked the complainant's brother. Members of both parties moved to separate defendant and the complainant's brother. The complainant, who was about 6'3" tall, placed himself between the men, with his back to his brother and his face to the defendant, who was about 5'9" tall.

¶ 6.    Defendant continued his attack, but now targeted the complainant. Trial witnesses' accounts differed regarding the location of the fight and the direction in which the fight was moving, but they all agreed that the complainant did not raise his hands or fight back during defendant's attack. Instead, the complainant walked towards defendant to maintain the space

2

between defendant and the complainant's brother, even though defendant repeatedly punched the complainant in the face. After defendant landed three or more punches, splitting the complainant's lip, a member of the complainant's party called the Burlington Police Department, and defendant and his two male friends fled south on Church Street.

¶ 7. With a description of two males, one in a sweatshirt and another in a grey t-shirt with "Chicago" written on it, the arresting officer and assisting officer circled the area, observed two individuals matching the description, and stopped them for questioning. Defendant initially denied being on Church Street or being involved in any altercation, but after continued questioning, the assisting officer heard defendant say, without admitting to being in the fight, that he was outnumbered and had fled south on Church Street. When the officers asked defendant to identify himself, he provided the name "Cameron Mitchell" and the birth date July 14, 1994. The officers discovered no Vermont records under the provided name and confronted defendant about the crime of providing false information to a police officer. It was then that defendant gave his full name, "Cameron Mitchell Albarelli," and correct birth date, July 14, 1995. Following this exchange, defendant was taken into custody and charged with the offenses listed above.

¶ 8. After the State concluded its case, defendant chose not to present witnesses or evidence. At a subsequent charge conference, defendant asked the court to instruct the jury on self-defense. The court refused to give a self-defense instruction because "no evidence at all" raised the issue of whether defendant believed he was in immediate danger of bodily harm.

¶ 9. Subsequently, the jury returned guilty verdicts on all three charges.

¶ 10. At sentencing, defendant asked the court to impose a sentence crafted around probation and rehabilitation with no further incarceration. The State requested two additional months of incarceration, as well as substance-abuse and anger-management counseling. The court imposed a sixty-day to two-year sentence, with all but sixty days suspended, which were to be

spent on work crew. In addition, the court imposed "standing conditions A through N" and several other conditions.

¶ 11. This appeal followed. Defendant argues that (1) his simple assault conviction should be reversed because the trial court failed to give a self-defense instruction; (2) his disorderly conduct conviction should not stand because the evidence was insufficient to convict and because the court failed to instruct the jury on unanimity; (3) his false information to a law enforcement officer conviction should be reversed because there was insufficient evidence to prove he had the purpose to deflect an investigation; and (4) the trial court committed a reversible sentencing error when it imposed defendant's probation conditions.

## II. Simple Assault and Self-Defense Instructions

¶ 12. Defendant challenges the trial court's refusal to provide a self-defense instruction to the jury. We affirm.

¶ 13. To be entitled to a defense instruction, defendant must establish a prima facie case for each element of the defense asserted. See State v. Wetter, 2011 VT 111, ¶ 17, 190 Vt. 476, 35 A.3d 962 (citing State v. Knapp, 147 Vt. 56, 59, 509 A.2d 1010, 1011 (1986)). Thus, a self-defense instruction is warranted only if a defendant can show that (1) he had an honest belief that he faced imminent peril of bodily harm and that (2) the belief was grounded in reason. See State v. Shaw, 168 Vt. 412, 414, 721 A.2d 486, 489 (1998). Once a defendant has satisfied the initial burden of production for the defense, the burden then shifts to the State to "disprove self-defense beyond a reasonable doubt." State v. Forant, 168 Vt. 217, 220, 719 A.2d 339, 401 (1998). Here, the court concluded that defendant did not meet his initial burden, and thus was not entitled to a self-defense instruction. We agree.

¶ 14. First, there is a dearth of evidence in the record to show that defendant believed he was in peril of imminent bodily harm. In fact, there is testimony that suggests the opposite. Two of the State's witnesses testified that, after the initial altercation between defendant and the

4

complainant had ended and the complainant's party had decided to remove themselves and call the police, defendant pursued the complainant's party, threatening to attack again. Another of the State's witnesses testified that defendant, with his friend's encouragement, continued hitting the complainant, even after it was apparent that the complainant was not striking back. Defendant suggests the evidence supports a belief of imminent peril, but he points only to the size difference between defendant and the complainant, compounded by the testimony that the complainant walked towards defendant.

¶ 15.    The trial court did not err when it found that this evidence, as a whole, did not support defendant's belief of imminent bodily harm. See, e.g., People v. Blair, No. 298377, 2011 WL 4501909, *3 (Mich. Ct. App. Sept. 29, 2011) ("The evidence regarding the size difference between the victim and defendant is not enough to support an inference of self-defense."); State v. Chambers, 671 S.W.2d 781, 783 (Mo. 1984) (en banc) ("Something more than fear of size, however, is required to justify . . . self-defense."); State v. Davis, No. 01JE-18, 2002 WL 924609, *2 (Ohio Ct. App. 2002) (refusing to find defendant had belief of imminent bodily harm and holding that even though victim was walking towards and pointing his finger at defendant, victim "was not waiving his fists in [defendant's] face," his "hand was not even balled into a fist, nor was [he] even touching [defendant]"); cf. People v. Rodriguez, 631 N.E.2d 427, 430 (Ill. App. Ct. 1994) (finding defendant presented sufficient evidence to raise issue of self-defense when record indicated that—along with evidence showing defendant was physically smaller than victims— defendant observed men beating another man; defendant attempted to break up fight; defendant was hit over head with beer bottle; defendant ran away but was chased by eight to ten larger men; and when defendant was cornered, he took out little pocket knife and "started swinging because [he] was scared").

¶ 16.    Further, defendant failed to show that his belief of imminent bodily harm was based in reason. Without citing supporting case law, defendant argues that the court should have inferred

5

the belief was reasonable from the evidence of the size difference and the forward progress of the complainant. This Court agrees with the lower court's conclusion there was "no evidence at all that [the complainant] was acting aggressively toward [defendant]," and thus concludes that the presented evidence was insufficient to infer a belief based in reason. See, e.g., People v. Dillard, 745 N.E.2d 185, 189 (Ill. App. Ct. 2001) (finding that evidence that victim was physically larger and had initiated first of two altercations could not support self-defense instruction); Rajnic v. State, 664 A.2d 432, 436 (Md. Ct. Spec. App. 1995) (affirming that evidence was sufficient to support jury's finding that defendant did not have reasonable belief of bodily harm, even though victims were larger than defendant, intoxicated, and "charged into defendant's bedroom on the heels of the threats"); State v. Broussard, 768 S.E.2d 367, 371 (N.C. Ct. App. 2015) (denying self-defense instruction where "uncontroverted evidence shows that defendant fully and aggressively participated in the altercation," even though defendant was significantly shorter and lighter than victim).

¶ 17. Defendant further contends that the law does not require defendant to wait until "[the complainant] cocked his fist back to punch" in order to be entitled to a self-defense instruction. We agree; it is well-established that "[t]he right of self-defense does not require that one be actually assaulted." State v. Wheelock, 158 Vt. 302, 307, 609 A.2d 972, 975 (1992). As described above, however, the right of self-defense does require that a defendant have an honest and reasonable belief that he faces imminent bodily harm. Shaw, 168 Vt. at 414, 721 A.2d at 489. Here, no evidence sufficiently established this belief. Because "[a] court's obligation to charge on a defendant's theory is limited to situations in which there is evidence supporting the theory," State v. Nunez, 162 Vt. 615, 617, 647 A.2d 1007, 1009 (1994) (mem.), the lower court did not err by refusing to instruct on self-defense after defendant failed to prove the necessary prima facie case.[1]

---

[1] We note that defendant presents several arguments as to why the alleged jury instruction error would not be harmless. Because defendant's arguments rest on the assumption that error occurred, which we conclude it did not, we do not address these arguments.

6

¶ 18. We find no error and affirm the lower court's refusal to issue a self-defense instruction.

### III. Disorderly Conduct

¶ 19. Couched in the self-defense jury instruction argument, defendant briefly contends that the evidence was insufficient to convict on disorderly conduct and that "there [was] a jury unanimity problem because the jury instructions did not require the jurors to be unanimous as to the conduct that resulted in [the disorderly conduct] conviction." We affirm.

### A. Insufficient Evidence

¶ 20. Defendant argues that the State did not produce evidence sufficient to establish the elements of disorderly conduct, as defined by 13 V.S.A. § 1026(a)—specifically, that the State failed to show defendant "recklessly creat[ed] a risk" of "public inconvenience or annoyance" by "engag[ing] in fighting . . . behavior." Id. "When considering a challenge to the sufficiency of the evidence, the court must determine if the evidence, viewed in the light most favorable to the State and excluding modifying evidence, fairly and reasonably supports a finding beyond a reasonable doubt." State v. Vargas, 2009 VT 31, ¶ 18, 185 Vt. 629, 971 A.2d 665 (mem.). "In doing so, we assess the strength and quality of the evidence; evidence that gives rise to mere suspicion of guilt and leaves guilt uncertain or dependent upon conjecture is insufficient." State v. Albarelli, 2011 VT 24, ¶ 17, 189 Vt. 293, 19 A.3d 130 (quotation omitted).

¶ 21. First, defendant contends that because there was a lack of evidence as to how the fight between defendant and the complainant's brother started, the State failed to produce sufficient evidence to show defendant "engaged in fighting behavior." "Where the statute does not specifically define a term, courts resort to the common understanding of the term." State v. Amsden, 2013 VT 51, ¶ 19, 194 Vt. 128, 75 A.3d 612. The verb "engage" is defined as "[t]o employ or involve oneself; to take part in; to embark on." Engage, Black's Law Dictionary 570 (8th ed. 2004). Thus, the State does not need to prove that defendant started the fight, but only

that he was part of it. Viewed in a light most favorable to the State, the witnesses' testimony that defendant repeatedly punched complainant's brother "fairly and reasonably supports" the conclusion that defendant "engaged in fighting behavior."[2] Vargas, 2013 VT 51 ¶ 18.

¶ 22. Defendant continues by arguing that the State did not sufficiently prove he recklessly caused the risk of public inconvenience or annoyance. We have adopted the Model Penal Code's definition of recklessness, which states:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Model Penal Code § 2.02(c); see, e.g., State v. Brooks, 163 Vt. 245, 251, 658 A.2d 22, 26 (1995); State v. O'Connell, 149 Vt. 114, 115 n.1, 540 A.2d 1030, 1031 n.1 (1987). Additionally, we have held that "[i]ntent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence." State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) (citation omitted). Thus, while "the conduct giving rise to the criminal liability is confined to that which was charged," defendant's behavior leading up to and following the charged conduct is "probative with respect to [his] mental state at the time of the alleged disorderly conduct." Amsden, 2013 VT 51, ¶ 25.

¶ 23. This Court has also affirmed that proof of defendant's awareness of the risk can be satisfied not only by evidence that a crowd of people were drawn to the incident, but also by evidence that the conduct occurred in a public place with or without people present. State v. Lund, 144 Vt. 171, 178-79, 475 A.2d 1055, 1060 (1984) (concluding that disorderly conduct may be

---

[2] The complainant testified to witnessing a fight between defendant and the complainant's brother. Two additional State witnesses, although unclear on the timeline of the fight with the complainant and the fight with the complainant's brother, testified that the complainant's brother was involved in a fight with defendant, and that the complainant attempted to separate the two.

8

based on showing that tumultuous behavior occurred in public place, with or without many people present), overruled on other grounds by State v. Begins, 148 Vt. 186, 531 A.2d 595 (1987); State v. Pickett, 137 Vt. 336, 338-39, 403 A.2d 272, 273-74 (1979) (finding sufficient evidence of intent where defendant engaged in threatening behavior while observed by crowd sufficient to establish intent).

¶ 24.   Here, the State presented evidence of defendant's behavior surrounding the charged conduct, including testimony that: the events of the night took place in a public place; there was a loud, heated exchange of words between defendant and complainant's group; at least one member of the public was drawn to the incident; members of both groups tried to separate defendant from the complainant's brother; and defendant pursued the complainant's group after both fights were separated.  We are satisfied that the circumstantial evidence, when viewed in a light most favorable to the State, "fairly and reasonably supports" the jury's conclusion that defendant was aware of the risk posed by his behavior but consciously disregarded it through behavior that was a gross deviation from that of a law-abiding person in defendant's situation.  See Pickett, 137 Vt. at 339, 403 A.2d at 274.

### B.  Unanimity-of-Jurors

¶ 25.   Defendant argues that his conviction of disorderly conduct for engaging in fighting behavior must be reversed because the court's instructions failed to identify what conduct was the basis for the charge—the fight with complainant's brother or the assault on complainant.  Before reviewing the merits of defendant's jury unanimity argument, it must be noted that this challenge was not preserved for appellate review per Vermont Rule of Criminal Procedure 30.  Because the record is void of any effort by defendant to object to the instruction on disorderly conduct, we can review only for plain error.  See State v. Myers, 2011 VT 43, ¶ 17, 190 Vt. 29, 26 A.3d 9.

¶ 26.   We have consistently held that "[p]lain error will be found only in rare and extraordinary cases where the error is obvious and strikes at the heart of defendant's constitutional

9

rights or results in a miscarriage of justice." State v. Streich, 163 Vt. 331, 353, 658 A.2d 38, 53 (1995); see also State v. Gagne, 2016 VT 68, ¶ 31,__ Vt.__, __ A.3d __; State v. Bruno, 2012 VT 79, ¶ 43, 192 Vt. 515, 60 A.3d 610. To find plain error, "(1) there must be an error; (2) the error must be obvious; (3) the error must affect substantial rights and result in prejudice to the defendant; and (4) we must correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." State v. Herrick, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285.

¶ 27. The Vermont Constitution ensures a defendant's right to unanimous jury verdicts. Vt. Const. ch. I, art. 10. "[W]here there is evidence of more than one act that would constitute the offense charged, the State must specify the act for which it seeks a conviction." State v. Gilman, 158 Vt. 210, 215, 608 A.2d 660, 664 (1992). This ensures a defendant's right to a unanimous verdict by protecting against the possibility that "part of the jury will base its decision to convict on evidence of conduct different from that considered by the rest of the jury." Id.

¶ 28. Looking at the instructions as a whole, we find that the court's instruction on disorderly conduct failed to specify the conduct the jury should examine to convict defendant of the charge. However, said failure does not rise to the level of plain error because it could not result in prejudice to defendant and the miscarriage of justice.

¶ 29. First, the trial court included a general instruction on unanimity, clearly stating the "necess[ity] that each juror agree to [each verdict]." State v. Verge, 152 Vt. 93, 97-98, 564 A.2d 1353, 1355-56 (1989) (finding no plain error where court gave general instruction on requirement of juror unanimity and defendant did not request special verdict); see also United States v. Eagle Elk, 820 F.2d 959, 961 (8th Cir. 1987) ("The mere fact . . . that an instruction could conceivably permit a jury to reach a non-unanimous verdict is not sufficient to require reversal when the jury has been instructed that it must reach a unanimous verdict.").

¶ 30. Of far more importance, in both the State's opening and closing arguments the disorderly conduct charge was specifically tied to defendant's altercation with complainant's

10

brother. Defendant's closing arguments recognized that the disorderly conduct charge was based on defendant's fight with the complainant's brother. "So one of the State's charges is disorderly conduct. They're saying that basically, you know, Mr. Albarelli engaged in fighting behavior on Church Street stemming from the altercation or alleged altercation with [the complainant's brother]." In his brief to this court, defendant acknowledges that "the State and the defense argued about whether the scuffle with [complainant's brother] constituted disorderly conduct for engaging in fighting behavior." Thus, although the court's instruction lacked specificity, no reversal is warranted; it is reasonable to conclude that the jury understood that the charge of disorderly conduct referred to defendant's fight with the complainant's brother.

## IV. False Information to a Police Officer

### A. Section 1754(a)

¶ 31. Defendant argues that 13 V.S.A. § 1754(a), which prohibits knowingly giving false information to a law enforcement officer, must be construed narrowly, so as to not criminalize otherwise protected speech. Although we agree that § 1754(a) must be construed to avoid criminalizing protected speech, we conclude that defendant's behavior falls squarely within § 1754(a)'s reach and that the statute, as applied, does not criminalize protected speech.

¶ 32. In May 2006, the Legislature amended § 1754(a). The modified section reads: "A person who knowingly gives false information to any law enforcement officer with purpose to implicate another or to deflect an investigation from the person or another person shall be imprisoned for not more than one year or fined not more than $1,000.00, or both." 13 V.S.A. § 1754(a) (emphasis indicates amendment language). Although the meaning of the original statutory language is well established, we have addressed the new language of § 1754(a) only once. See State v. Delaoz, 2010 VT 65, 189 Vt. 385, 22 A.2d 388, superseded by statute on other grounds as stated by State v. Scott, 2013 VT 103, 194 Vt. 330, 88 A.3d 1173. There, we were asked to determine the admissibility of a piece of evidence. Without examining the specific statutory

11

language, we held that "[b]ecause intent must be inferred from a person's acts and proved by circumstantial evidence, possession of a handcuff key triggers a reasonable inference that defendant . . . had taken steps to avoid prosecution and punishment." Id. ¶ 30. Because Delaoz speaks only to the issues of evidence admissibility and sufficiency, we are still left with the task of construing the meaning and breadth of § 1754(a).

¶ 33. Our main goal in "statutory construction is to determine and give effect to the intent of the Legislature." In re C.S., 158 Vt. 339, 343, 609 A.2d 641, 643 (1992) (citation omitted). To do so here, we look at the meaning of one operative clause: "A person who knowingly gives false information to any law enforcement officer with purpose . . . to deflect an investigation from the person." First, structurally and grammatically, all three elements are within a single clause. Each one is intrinsically linked to the next—the false information must be given to a law enforcement officer and it must be given with the purpose to deflect an investigation. These are not separate elements that can be checked off individually; instead, they are one clause explaining the action necessary to violate § 1754(a).

¶ 34. Next, when specifically considering the phrase "with purpose to deflect an investigation from the person," we look at the plain meaning of the individual language. The Model Penal Code, which forms the basis for the statute's original iteration,[3] states that a person acts purposely if, when "the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result." Model Penal Code § 2.02(2)(a) revised cmts. (Am. Law Inst., Proposed Official Draft 1985). And, the verb "deflect"

---

[3] The MPC § 241.5, which covers "False Reports to Law Enforcement Authorities," reads "(1) Falsely Incriminating Another. A person who knowingly gives false information to any law enforcement officer with purpose to implicate another commits a misdemeanor." The original version of pre-2006 version of § 1754 mirrors this closely, reading, "A person who knowingly gives false information to any law enforcement officer with purpose to implicate another [commits a misdemeanor]." 1981, No. 223 (Adj. Sess.), § 23. However, § 1754 parted ways with the MPC when the "deflect" clause was added in 2006. 2005, No. 149 (Adj. Sess.), No. 149 § 1.

12

is defined as "to keep (something, such as a question) from affecting or being directed at a person or thing." Deflect, Merriam-Webster, http://www.merriam-webster.com/dictionary/deflect [https://perma.cc/EA6R-FA8W]. Taking these two plain meanings together, to violate § 1754(a), an individual must give false information to a law enforcement officer to achieve his or her conscious objective of directing the investigation away from him or herself. Here, defendant's actions fit squarely within this definition. See infra ¶¶ 36-43.

¶ 35. We recognize that the language of § 1754(a), if interpreted too broadly, could result in the statute's uncertain application in some factual circumstances. Indeed, after a brief comparison to other similar statutes it is clear that, in some respects, the statutory language is more broad than other statutes, while in other respects it is more narrow.[4] Defendant seizes on this ambiguity at the fringes of § 1754(a) and argues that the broad application of § 1754(a) could result in the criminalization of otherwise protected speech. In these circumstances, however, we are not dealing with a broad restriction on false speech because the statutory prohibition is linked to preventing government waste.

¶ 36. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002) (quotation omitted). Although this

---

[4] For example, § 1754(a) criminalizes false information intended to deflect the investigation from the speaker, but the majority of other state statutes limit false-reporting misdemeanors to actions intended to incriminate or implicate another person. See, e.g., N.J.S.A. 2C:28-4 ("A person who knowingly gives . . . false information . . . with purpose to implicate another."); 18 Pa.C.S.A. § 4906(a) ("A person who knowingly gives false information . . . with the intent to implicate another."); M.C.A. 45-7-205 ("A person . . . knowingly . . . gives false information . . . with the purpose to implicate another."); K.R.S. § 519.040 ("A person is guilty of falsely reporting an incident when he . . . [k]nowingly gives false information to any law enforcement officer with intent to implicate another."). At the same time, the word "deflect" is only used in § 1754(a), which appears to narrow the statute's application in comparison to similar statutes. Cf., e.g., K.R.S. § 519.040; N.C.G.S.A. § 14-22 ("[A]ny person who shall willfully make or cause to be made to a law enforcement agency or officer any false, deliberately misleading or unfounded report, for the purpose of interfering with the operation of a law enforcement agency . . . shall be guilty of a Class 2 misdemeanor.").

protection extends to the majority of false speech, the U.S. Supreme Court has made clear that the First Amendment does not protect all false statements "made by any person, at any time, in any context." United States v. Alvarez, __ U.S. __, 132 S. Ct. 2537, 2544-45 (2012) ("[C]ontent-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar." (quotations omitted)). For restrictions on speech to stand, even restrictions on false speech, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." Id. at 2547. In Alvarez, for example, the U.S. Supreme Court noted that such a link exists when the statute in question "also protect[s] the integrity of Government processes, quite apart from merely restricting false speech." Id. at 2546. Similarly, under § 1754, the prohibition of false speech is directly linked to a defendant's intent to deflect a government investigation, thus preventing government waste.[5] We do not read § 1754(a) to criminalize all false statements to law enforcement agents, regardless of a defendant's intent. Rather, as stated above, the statute prohibits false statements intended to deflect an investigation.

### B. Sufficiency of the Evidence

¶ 37.    Defendant argues that the trial court erred by denying his motion for judgment of acquittal on the charge of giving false information to law enforcement with the purpose of deflecting the investigation. He contends that the State failed to produce evidence sufficient to prove defendant had the intent to deflect the investigation from himself. We affirm.

¶ 38.    We review denial of a motion for judgment of acquittal de novo. State v. Ellis, 2009 VT 74, ¶ 21, 186 Vt. 232, 979 A.2d 1023. A judgment of acquittal is proper only if the State failed to put forth any evidence to support a jury verdict. See State v. Couture, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999); V.R.Cr.P. 29. As explained above, "[w]e are not triers of fact, and we

---

[5] Defendant argues that this direct link is missing. We disagree. As explained above, the Alvarez court specifically noted that statutes protecting the integrity of government processes link the restriction on false speech to the prevention of government waste. Alvarez, 132 S. Ct. at 2547.

will not substitute our judgment for that of the jury." State v. Johnson, 2013 VT 116, ¶ 27, 195 Vt. 498, 90 A.3d 874. This Court must "consider[] whether 'the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt.'" Ellis, 2009 VT 74, ¶ 21 (quoting State v. Turner, 2003 VT 73, ¶ 7, 175 Vt. 595, 830 A.2d 122 (mem.)).

¶ 39. Defendant was charged under § 1754(a) for allegedly "giv[ing] false information to any law enforcement officer with purpose [to] . . . deflect an investigation from [himself]." Defendant correctly notes, as made clear from the language and from our discussion above, that the intent to deflect an investigation away from one's self is an essential element, which the State bears the burden of proving.[6]

¶ 40. As explained above, § 1754(a) has been at issue before us only once. See Delaoz, 2010 VT 65. The Delaoz facts are as follows. Officers responded to a report of an individual screaming in the middle of the street, where they found the defendant. Id. ¶ 2. When approached, the defendant admitted responsibility for the noise but identified himself by a false name. Id. During the encounter, officers discovered drugs, including cocaine and marijuana, in the defendant's possession. Id. ¶¶ 3-4. When the defendant was taken into custody, officers found a handcuff key inside the defendant's shoe and subsequently confirmed the defendant's real identity. Id. ¶¶ 5, 9. At trial, the defendant moved to exclude evidence of the handcuff key as both irrelevant and prejudicial. Id. ¶ 29. The trial court denied the defendant's motion, finding that the relevancy

---

[6] We acknowledge defendant's brief aside regarding the discrepancy between the language of the statute and the language of the Act Summary—the first states "deflect an investigation from the person or another person" while the latter states "deflect an investigation from the person to another person." However, after a review of the legislative history and the numerous drafts of the bill, all of which contain the language "deflect an investigation from the person or another person," it is reasonable to conclude the Act Summary contains a clerical error and was intended to reflect the language of the enacted bill. See Vermont General Assembly, Summary, Act No. 149 (S. 186), Crimes; false reports to law enforcement authorities, http://www.leg.state.vt.us/docs/legdoc.cfm?URL=/docs/2006/acts/ACT149SUM.HTM [https://perma.cc/UJ58-QZSF].

of the evidence to the defendant's state of mind outweighed its possible prejudicial effects. Id. This Court affirmed, finding that "[b]ecause intent must be inferred from a person's acts and proved by circumstantial evidence, possession of a handcuff key triggers a reasonable inference that defendant . . . had taken steps to avoid prosecution and punishment." Id. ¶ 30 (citing Cole, 150 Vt. at 456, 554 A.2d at 255 ("Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence.")).

¶ 41. Defendant argues that this Court implicitly recognized in Delaoz that giving a false name is never alone sufficient to sustain a conviction under § 1754(a). We agree that § 1754(a) requires more than just the giving of false information—it requires the giving of false information with the intent to deflect the investigation. In Delaoz, however, the issue was the admissibility of the handcuff key evidence—it was not whether the § 1754(a) conviction could have been sustained without said evidence. Additionally, we have repeatedly "decline[d] to fashion a hard and fast rule regarding the sufficiency of evidence in a circumstantial evidence case. Rather, each case must be based on its own facts and circumstances." Couture, 169 Vt. at 226, 734 A.2d at 527. Thus, we refuse to hold that evidence of a defendant giving a false name alone is never sufficient to sustain a conviction under § 1754(a) and, as with all other cases involving circumstantial evidence, we must look at the record as a whole and determine if it can fairly and reasonably convince a jury of guilt.

¶ 42. The State produced the following evidence through witness testimony: defendant fled the scene of the altercation on Church Street after expressing anger that the complainant's party called the police; officers found defendant, who looked as though he was perspiring, at the south end of Church Street; officers began to question defendant because he matched the witnesses' descriptions of the individual involved in the altercation at the north end of Church Street; defendant denied being on Church Street or being involved in a fight, but then, without admitting to being in a fight, stated that he was outnumbered and had fled south on Church Street;

16

when asked for his name, defendant provided his first and middle name and correct birth month and day, but incorrect birth year; when the provided name produced no Vermont records and the officers confronted defendant with providing false information to a police officer, defendant provided his true full name and birth date.

¶ 43.    With this evidence, the question presented to the jury was whether the evidence proved beyond a reasonable doubt the State's allegation that defendant provided false information to the police officers with the intent to deflect the investigation away from himself.  They were not asked, as defendant tries to argue, whether defendant knew he was already under investigation and did not feel free to leave, whether defendant thought that giving the false information would successfully deflect the investigation from himself, whether defendant chose a good method in attempting to deflect the investigation, whether the police officers had the authority to arrest defendant before the false information was given, whether the police officers had some other method to fulfill all identity-related needs they had, or whether defendant was actually successful in his deflection.

¶ 44.    When viewed in a light most favorable to the State, the evidence presented reasonably and fairly supports the jury's conclusion that defendant, by providing the police officers with his first and middle name and an incorrect birth year, intended to deflect their investigation away from himself.  Cf. In re Q.P., 2015 IL 118569, ¶¶ 23-27, 40 N.E.3d 9 (Ill. 2015) (finding evidence of juvenile giving misspelled name and false birthdate, even after being handcuffed and placed in police car, sufficient to show juvenile intended to avoid apprehension on outstanding arrest warrant and thus support obstruction of justice conviction); Edmonson v. Commonwealth, 448 S.E.2d 635, 637 (Va. 1994) (finding that use of false name following commission of crime can constitute form of flight).[7]

---

[7]    We disagree with defendant that neither Edmonson nor In re Q.P. is applicable to the case at hand.  Defendant argues the Edmonson defendant gave his false name during the initial investigation process, which, in this case, had been completed by the time defendant gave the false

17

¶ 45. We find there was sufficient evidence in the record to support defendant's conviction and so affirm.

## V. Probation Conditions

¶ 46. Defendant presents several arguments regarding his probation conditions: first, the sentencing court failed to exercise its discretion and violated Vermont's individualized sentencing scheme by imposing "standard conditions" A through N; second, the sentencing court's oral pronouncement of conditions should control over the broader, written probation order with regard to conditions M, 1, 3, 5, and O through S; third, Conditions A, D, and E should be vacated because they are harsh or have no reasonable relationship to defendant's conviction or public safety; and fourth, Conditions K and 5 should be vacated as an unlawful delegation of sentencing authority.

¶ 47. Probation is governed by 28 V.S.A. § 252, under which a court is permitted to impose such probation conditions as, "in its discretion[, it] deems reasonably necessary to ensure that the offender will lead a law-abiding life or to assist the offender to do so." In addition to eighteen potential probation conditions, § 252(a) mandates that courts "provide as an explicit condition of every sentence to probation that if the offender is convicted of another offense during the period for which the sentence remains subject to revocation, then the [c]ourt may impose revocation of the offender's probation." Thus, as we held in State v. Putnam, "the only truly 'standard' condition is [Condition B,] the one providing that the court may revoke an offender's

_____

information. However, the Edmonson false information was given well after the "initial investigation process"—the Edmonson defendant gave the false name after the police approached the defendant at a motel, asked him if he owned the car that was seen leaving the crime scene, left the motel to obtain a search warrant, returned to the motel, and began executing the search warrant. 488 S.E.2d at 636. Similarly, defendant argues that Q.P. is inapplicable because the Q.P. defendant provided information to deflect an investigation other than the one that initiated his contact with the police. In re Q.P., 2015 IL 118569, ¶¶ 23-27. This is a misreading. Q.P., much like Edmonson, speaks to the timing of the false information—false information, even given after a defendant is in police custody, can still be an attempt to deflect an investigation. Moreover, as was true here, the defendants in both cases knew they were the center of an investigation at the time they provided false information to the police.

18

probation if the offender is convicted of another offense during the period when the sentence is still subject to revocation." 2015 VT 113, ¶ 28, __Vt. __ 130 A.3d 826 (citing § 252(a)).

¶ 48.    "A trial court enjoys broad discretion in fashioning a sentence," including probation conditions. Putnam, 2015 VT 113, ¶ 28 (citing State v. Gibney, 2003 VT 26, ¶ 53, 175 Vt. 180, 825 A.2d 32). We review for abuse of such discretion, ensuring the sentencing court used " 'sound discretion,' not discretion exercised arbitrarily, but with due regard for that which is right and equitable under the circumstances, and directed by reason and conscience to a just result." Putnam, 2015 VT 113, ¶ 28 (quoting State v. Hunt, 145 Vt. 34, 43, 485 A.2d 109, 113 (1984)). The conditions will be upheld as long as "there is a reasonable basis for the court's action." State v. Savo, 141 Vt. 203, 208, 446 A.2d 786, 789 (1982) (citation omitted). The party alleging the abuse bears the burden to "show that the court failed to exercise its discretion or did so for 'reasons clearly untenable or to an extent clearly unreasonable.' " Putnam, 2015 VT 113, ¶ 44 (quoting Savo, 141 Vt. at 208, 446 A.2d at 789).

¶ 49.    Defendant contends that the sentencing court abused its discretion by imposing conditions A-N "without individualized findings or reasons supporting each condition." This Court has addressed this argument several times. In Putnam we held that "[t]o determine if the court acted within its discretion in imposing particular conditions, we have not required the sentencing court to make specific findings regarding each condition, but have looked to whether the record supports the court's exercise of its discretion." Putnam, 2015 VT 113, ¶ 45 n.10 (noting that in some instances, "particularized findings may be necessary to support imposition of a condition for reasons other than demonstrating the requisite nexus"). Subsequently in State v. Levitt, we reiterated Putnam's rejection of a narrow reading of § 252, found that this Court "must examine the record available to the trial court regarding each complained-of condition," and declined to summarily reject Conditions A-N "on the ground they were all erroneously imposed." 2016 VT 60, ¶¶ 17-18, __ Vt. __, __ A.3d __. We do so here.

¶ 50. Condition A requires defendant to notify his probation officer within forty-eight hours if he is arrested or given a citation for a new offense. Defendant contends that Condition A is not "finely-tuned" and may result in revocation for a defendant who never violates § 252(a)'s mandate that a defendant not commit a new crime. In Putnam, we held that Condition A "is linked to enforcing the mandatory condition that defendant not be convicted of another crime, and assists the probation officer in knowing if defendant has been involved in any criminality." 2015 VT 113, ¶ 48. We uphold Condition A, here, finding that it reasonably relates to aiding defendant in leading a law-abiding life in light of the record's evidence of other convictions and the crime for which he was convicted of below.

¶ 51. The State concedes that the record does not support the imposition of Conditions C-E because it does not show that the conditions would address the conduct for which defendant was convicted or aid him in leading a law-abiding life. Condition C requires defendant to regularly work at a job, look for a job, or get job training if his probation officer tells him to do so. Condition D requires defendant to work regularly at a community service job if ordered by the court. Condition E requires defendant to support his dependents or meet other family responsibilities. We agree the record does not support the imposition of these conditions and strike Conditions C, D, and E.

¶ 52. Conditions F, G, H, I, and J are all similar to Condition A because they also relate to the supervision of defendant by his probation officer. Condition F requires defendant to meet with his probation officer, upon request. Condition G requires defendant to notify his probation officer within two days if he moves or if his address changes. Condition H requires defendant to tell his probation officer if he loses or changes his job. Conditions G and H are "mere notification requirement[s] that neither impinge[] on any fundamental freedom nor permits a probation officer to wield any kind of discretion." Levitt, 2016 VT 60, ¶ 23. Although Condition F permits a probation officer to exercise minor discretion to determine when to meet defendant, it is directly

20

related to the "supervision of defendant by his probation officer to assist defendant in leading a law-abiding life." Putnam, 2015 VT 113, ¶ 48. Because Conditions F, G, and H are "basic, administrative requirements that are necessary to supervised release," United States v. Thomas, 299 F.3d 150, 155 (2d Cir. 2002) (quotation omitted), and do "not burden defendant, unduly restrict protected freedoms, or delegate sentencing authority to a probation officer—we affirm [their] imposition." Levitt, 2016 VT 60, ¶ 23.

¶ 53. Condition I prohibits defendant from leaving Vermont without written permission from his probation officer. In Levitt, we concluded that although Condition I is valid on its face, it "turn[s] over to a probation officer the complete power to determine defendant's [ability to travel], with no guiding standards." Id. ¶¶ 25, 27 (quotation omitted). Because "the reasons why defendant would need to travel outside of Vermont are predictable, and defendant can give prior notice of the time of the travel, destination, and reason for it[,] . . . we believe that standards can be created even though they may, in turn, accord substantial discretion in making the decision." Id. ¶ 28. Thus, we remanded Condition I for the sentencing court to add the necessary guiding standards. We do so here, as well.

¶ 54. We also discussed Condition J—which requires defendant, upon request and without delay, to allow his probation officer to visit him wherever he is staying—at length in Levitt. 2016 VT 60, ¶¶ 29-32. There, after a survey of both federal and state law, we concluded that "a home visit is not a search and a home-visit requirement does not run afoul of the Vermont or Federal Constitution search and seizure provisions." Id. ¶ 32. We held that home visits are "legitimate tool[s] of probation administration and [are] valid." Id. Similarly, we uphold the imposition of Condition J in this case.

¶ 55. Condition K orders defendant to participate in any counseling or training program deemed appropriate by his probation officer and to complete said counseling or program to the satisfaction of his probation officer. Defendant argues that Condition K should be vacated as

unlawful delegation of sentencing authority. The State concedes that this condition gives the probation officer the open-ended authority found to constitute plain error in Putnam. 2015 VT 113, ¶ 73. Condition 31, mandating anger management and mental health counseling per his probation officer, fails for these same reasons. Thus, we remand Conditions K and 31 to give the trial court an opportunity to make findings to support, revise, or remove the conditions.

¶ 56. Condition L prohibits defendant from buying, having, or using any regulated drugs unless they are prescribed by a doctor. "A condition that forbids criminal conduct is valid." State v. Whitchurch, 155 Vt. 134, 137, 577 A.2d 692, 692 (1990). Thus, "[b]ecause the condition precludes conduct that is criminal, the trial court was not required to find a reasonable relationship between defendant's conviction and the condition." Putnam, 2015 VT 113, ¶ 56. We affirm the imposition of Condition L.

¶ 57. Condition M authorizes defendant's probation officer or any other person authorized by said officer to require defendant to have random urinalysis testing. Defendant contends that Condition M exceeds the oral pronouncement of conditions, and thus the oral pronouncement should control over the broader, written probation order. Additionally, he argues that "the absence of the necessary findings not only invalidates the warrantless search condition[] itself, but also demonstrates the court did not intend to impose the[] obligation[]." In Putnam, we concluded that "[t]o the extent that the testing is not limited to detecting the use of regulated drugs and the condition thus authorizes regulation of otherwise lawful conduct, with significant implications for defendant's liberty, it must bear some reasonable relationship to the crime for which he was convicted." 2015 VT 113, ¶ 57. There, we found the record contained no such evidence, and thus struck the condition. Id. Here, we find a similar lack of supporting evidence and specificity of the condition. Although the sentencing court suspected that alcohol was involved in the offense, and defendant himself admitted to abusing alcohol, there was no evidence

presented to indicate defendant also abused drugs. Because the scope of testing permitted by the condition is not tailored to defendant's rehabilitation, we strike Condition M.[8]

¶ 58. Condition N prohibits violent or threatening behavior at any time. The sentencing court reasonably found a relationship between the condition—forbidding violent and threatening behavior, including threats of personal injury or property damage—and the crime for which defendant was convicted—simple assault. We affirm the imposition of Condition N, as modified by Condition 33, to prohibit verbal, written, or electronic threats of personal injury or property damage.

¶ 59. The State concedes that "there does not appear to be a nexus" between Condition O, which prohibits defendant from operating, trying to operate, or being in actual physical control of a motor vehicle on a public highway unless in possession of a valid Vermont operator's license, and defendant's rehabilitation or crime. Because this condition could pertain to conduct which may or may not be criminal, the trial court was required to find a reasonable relationship between defendant's conviction and the condition." Cf. Putnam, 2015 VT 113, ¶ 59. Because that nexus does not exist, we strike Condition O. Similarly, Conditions Q and R are related to restitution and because the sentencing court did not order restitution, the conditions are inapplicable and will be struck.

¶ 60. Condition 1 completely prohibits defendant from buying, having, or drinking any alcoholic beverages. To enforce this prohibition, Condition 1 requires defendant to submit to alcosensor tests or any other alcohol test when his probation officer or their designee tell him to do so. It is apparent that Condition 1 is at direct odds with Vermont's policy regarding alcohol and drug abuse programs under 18 V.S.A. § 4801. Through § 4801, the Legislature declared "[i]t

---

[8] Because we are striking on other grounds, we need not address defendant's argument of whether the oral pronouncement or written order of Condition M should control. Moreover, as in Putnam, because we strike the condition based solely on the lack of nexus, we do not reach defendant's argument that condition M, which authorizes his probation officer to require random urine analysis, is unconstitutional. Putnam, 2015 VT 113, ¶ 57 n.16.

is the policy of the State of Vermont that alcoholism and alcohol abuse are correctly perceived as health and social problems rather than criminal transgressions against welfare and morals of the public." And the Legislature also announced that "alcoholics and alcohol abusers shall no longer be subjected to criminal prosecution solely because of their consumption of alcoholic beverages." § 4801(b)(1). Condition 1 does exactly that—it criminalizes, through probation revocation, defendant's failure to overcome his alcohol abuse issues. This condition sets up for failure alcoholics and alcohol abusers, whom the Legislature intended to protect from "criminal prosecution solely because of their consumption of alcohol."

¶ 61. As stated before, the purpose of imposing probation conditions is to "ensure that the offender will lead a law-abiding life or to assist the offender to do so." 28 V.S.A. § 252. Neither Condition 1's complete prohibition of alcohol nor Condition 1's alcosensor requirement achieves this goal. Instead, they impose a strict limitation that will likely be violated, not because of defendant's delinquency, but because of his "inability . . . to moderate consistently his . . . drinking practices in spite of the onset of a variety of consequences deleterious to his . . . health." 18 V.S.A. § 4802(2)(B). Thus, we strike all of Condition 1.

¶ 62. Unlike Condition 1, Condition P does not categorically prohibit defendant from drinking alcoholic beverages. Instead, Condition P prohibits defendant from drinking alcoholic beverages to the extent it interferes with his employment or the welfare of his family, himself, or any other person. Defendant plainly admitted to having an alcohol-abuse problem, and defendant has previously been convicted of alcohol related offenses. We find that the record supports Condition P's narrower prohibition of alcohol consumption because it does not, as Condition 1's complete prohibition does, criminalize defendant solely because of his consumption of alcohol. Rather, the alcohol prohibition is linked to preventing his future criminality and ensuring his alcohol consumption does not interfere with his ability to lead a law-abiding life. Thus, we uphold

24

Condition P's limited prohibition of alcohol consumption and the attendant alcosensor tests necessary to administer the condition.

¶ 63. Condition S requires defendant to pay any unpaid amounts due to the court or the Tax Department for any legal services provided at state expense. This Court follows Putnam, and upholds Condition S. 2015 VT 113, ¶ 61.

¶ 64. Defendant contends that Conditions 3 and 5 are broader than the sentencing court's oral pronouncement, which (a) prohibited defendant from purchasing, possessing, or drinking any alcohol, (b) directed defendant to participate in substance-abuse screening and, if so directed, complete counseling and treatment to his probation officer's satisfaction, and (c) required defendant to complete mental health and/or anger management counseling to the satisfaction of his probation officer.

¶ 65. Condition 3 requires defendant to have alcohol and/or drug screening, and, if the screening shows that counseling and/or treatment is needed, he must attend and participate in whatever counseling and/or treatment his probation officers tells him to. Condition 3 falls squarely within the oral pronouncement that defendant was to participate in substance abuse screening and if directed, to complete counseling or treatment. The written statement simply separates each step into a different sentence—defendant must have alcohol screening; if screening indicates the need for counseling and/or treatment, his probation officer will direct him to do so; if he is directed to do so, he must complete it to his officer's satisfaction. Thus, we uphold Condition 3.

¶ 66. Condition 5 requires defendant to attend, participate in, and complete a residential treatment program if his probation officer tells him to do so. The State concedes that Condition 5 does not specify the type of residential training that the probation officer has the authority to order. Thus, this gives the probation officer the same open-ended authority as we found with Condition K. Therefore, we remand Condition 5 for the sentencing court to justify the condition, make it more specific, or strike it.

¶ 67.   Condition 32 notes that defendant is subject to standard conditions A-N.  We strike Condition 32 as failing to follow our directive for individualized sentencing.

¶ 68.   Finally, the following conditions are uncontested and thus we affirm their imposition: Condition 4, requiring defendant to allow any treatment or counseling program to tell his probation officer and the court about his attendance and participation in the program; Condition 33, amending Condition N to prohibit verbal, written, or electronic threats of personal injury or property damage; Condition 34, allowing defendant's probation officer to restrict associates and set a curfew; Condition 35, prohibiting defendant from contacting complainant or complainant's brother; and Condition 36, authorizing electronic monitoring per defendant's probation officer.

Affirmed as to defendant's simple assault conviction under 13 V.S.A. § 1023(a)(1), disorderly conduct conviction under 13 V.S.A. § 1026(1), and conviction for false information to a police officer with intent to deflect under 13 V.S.A. § 1754(a). Probation conditions A, B, F, G, H, J, L, N (as modified by 33), P, S, 3, 4, 34, 35, and 37 are affirmed.  Conditions C, D, E, M, O, P (alcosensor testing portion), Q, R, 1, and 32 are struck.  Conditions I, K, 5, and 31 are remanded to the sentencing court to justify the conditions, make them more specific, or strike them.

FOR THE COURT:

_____

Associate Justice